OPINION OF THE COURT
William D. Friedmann, J.
This proceeding places in focus the competence of a sign language interpreter used to assist two Grand Jury witnesses who are profoundly deaf and speech impaired.
*106 Archaically these persons would be termed "deaf-mutes”, and will be so referred to where necessary with regret. From a modern day professional standpoint, the more correct disability classification would be persons with profound hearing and speech impairments. Such persons may have some hearing and some facility of speech. There are more than 200,000 such disabled persons[1] in the United States. Most, as do other handicapped individuals, need special training programs, in this case, in order to assist them in communicating in a hearing-speech oriented world.[2]
Specifically in this prosecution for attempted robbery in the first degree (two counts), and attempted robbery in the second degree (two counts), dismissal of an indictment is sought (CPL 210.20 [1] [c]; 210.35 [5]), for alleged failure of the prosecution to provide, during a Grand Jury presentation, a competent qualified sign language interpreter to assist the two hearing and speech deficient witnesses while testifying before that Grand Jury (Judiciary Law §§ 387, 390; CPL 190.25 [3] [d]).
LAW

Profoundly deaf and speech impaired as a witness

Modern legal authorities and statutes reject the ancient presumption of law that deaf-mutes were idiots and therefore incompetent to testify in legal proceedings (King v Steel, 1 Leach CL 451 [1787], approving 1 Hale PC 34). Currently, the accepted principle is that "deaf and mute” persons are competent witnesses in legal proceedings when they exhibit sufficient understanding as to the nature of an oath, as well as an *107 understanding of the facts which they wish to communicate, and are capable of communicating in some approved manner, their ideas with respect thereto (81 Am Jur 2d, Witnesses, § 69; Cowley v People, 83 NY 464 [1881]; People v McGee, 1 Denio 19 [1845]). See generally, the limited reported authorities related to a "deaf-mute” as a witness in judicial proceedings which have been gathered at Annotation, Deaf-Mute as Witness, 50 ALR4th 1188, which updates an earlier Annotation at 9 ALR 482.
Summarily stated, the relevant law, as it relates to the Grand Jury presentation here under consideration, and with respect to (1) the communication ability of the two profoundly deaf-speech impaired witnesses, both former students at the Lexington School for the Deaf (the defendant, profoundly deaf and speech impaired, presently attends that same institution) and (2) the qualification and background of the interpreter involved is as follows: A court has the inherent power to elicit testimony from a competent "deaf and mute” person by whatever means or method is deemed necessary (Cowley v People, supra; and see, Annotation, Accused — Right to Interpreter, 36 ALR3d 276, 293-294).
Such determination should follow an appropriate inquiry into the necessity for interpretive services. (Annotation, Accused — Right to Interpreter, op. cit., at 294-296.)
Reported authorities indicate that competent deaf and mute persons may give evidence by signs or through an interpreter or by writing if that person can read and write (Cowley v People, supra; Annotation, Deaf-Mute as Witness, op. cit., § 4, at 1196-1197).
Currently, the mode of communication most generally used by deaf and/or speech limited persons in legal proceedings and in other aspects of communication in the hearing world is through the involvement of a competent qualified sign language interpreter (Annotation, Deaf-Mute as Witness, op. cit., § 5, at 1197-1198).
In the past, the "go-between” these disabled persons and the hearing world was afforded by a wise hearing person, often a family member or friend. This technique often worked reasonably well, but also created many problems (see, Annotation, Disqualification for Bias of Interpreter, 6 ALR4th 158; Annotation, Use of Interpreter in Court Proceedings, 172 ALR 924, 941).
During the past 20 years, the profession of trained experi *108 enced sign language interpreters has developed with standards of education, screening, training, certification and ethics (see, 1987 Annual National Registry of RID Certified Interpreters [Registry of Interpreters For The Deaf; RID Publications, Silver Spring, Md] [including RID Objectives, Activities, Code of Ethics, and Explanation of Listings of Certifications]).
Basic to the selection of a sign language interpreter is the matching of need with translation ability. That is the level of communication skill of the person needing assistance must be matched with the level of communication skill or competency of the interpreter or "go-between” (People v McGee, 1 Denio 19 [1845], supra). Such a pairing is not always easy as sign language techniques and/or methods are more varied and complex than the average uninformed person with the ability of hearing and speech has been led to believe.
American Sign Language (ASL), which is used by most deaf persons, is a visual-gestural language. It is a distinctly separate language from English. It has its own grammar, inflections and idioms (Becker and Padden, American Sign Language, A Look at Its History, Structure and Communication [T.J. Publishers]).
There are various manual communication systems in use which involve reductions, mixtures and new structures when compared to both ASL and English. (Caccamise and Drury, A Review of Current Terminology In Education of The Deaf, The Deaf American, vol 29, No. 1, Sept. 1976 [with appendix including brief explanation of various sign systems].) Such systems are labeled as Manually Coded English or Manually Signed English designed to represent English grammar.
(A) Pidgin Sign English involves the use of ASL signs in English word order with the proportions of ASL and English varying according to practitioners.
(B) Manual English supplements the signs of Pidgin English with invented signs to manually represent every English word and inflection system.
(C) Finger Spelling involves the use of handshapes, movements and orientations to represent letters of the alphabet and ampersand.
(D) Visible English and the Rochester Method — use of fingerspelling and speech together without signs.
The above sign systems should be compared with some manual communication systems which refer to signs and signing understood by relatively small groups of people.
*109 (E) Home Signs — signs developed and used by individual families such as used by the interpreter Ms. Mazzeo herein.
(F) School Signs — developed and used by different schools and
(G) Local Signs which are somewhat like regional dialects.
(H) A combination of in-group signs and ASL or Manually Coded English.
As can be seen, when the need for interpretation services is demonstrated, it is necessary to match up the need with interpretative ability. A preliminary inquiry should be held into the nature of a person (witness or party’s) physical and/ or mental disability and that person’s method and level of communication skills, and into the respective skills of the interpreter. (People v McGee, supra.)
While there seems to be no specific Federal or State constitutional right to be furnished interpretive services in court proceedings, the failure of a trial court to appoint a qualified interpreter for an accused or a witness once that need has been demonstrated would seem to this court to be a clear denial of due process of law (US Const 5th Amend; NY Const, art I, § 6; and generally see, Annotation, Accused — Right to Interpreter, op. cit., at 276, 287).
Recognizing this due process obligation, our Legislature has made provision to empower our courts to appoint temporary interpreters in court proceedings (Judiciary Law § 387). Such appointment power has been held to encompass interpretation for witnesses or parties with physical and mental disabilities (People v Miller, 140 Misc 2d 247; People v Johnny P., 112 Misc 2d 647; and see, People v Thompson, 28 NY2d 616, affg 34 AD2d 561 [where the Appellate Division, Second Department, and the Court of Appeals had the opportunity to address a similar issue but did not as the defendant there was acquitted]). In Thompson, the victim/witness was deaf and illiterate but was able to read lips. He did not know sign language and communicated by making verbal sounds which could be understood only by those with special training. The trial court there allowed a speech therapist to interpret. Whether that trial court had such authority was not addressed upon appeal.
Our Legislature has, in addition, made special provision with respect to a court’s providing an interpreter for deaf persons involved in court proceedings. Section 390 of the Judiciary Law states: "Whenever any deaf person is a party to *110 a legal proceeding of any nature, or a witness therein, the court in all instances shall appoint a qualified interpreter of the deaf sign-language to interpret the proceedings to, and the testimony of, such deaf person.”
However, with respect to a Grand Jury proceeding, the Criminal Procedure Law has carved out an exception to the court’s appointment obligation by placing the responsibility for the appointment of an interpreter in Grand Jury proceedings on the shoulders of the prosecutor. CPL 190.25 (3) (d) states: "An interpreter. Upon request of the grand jury, the prosecutor must provide an interpreter to interpret the testimony of any witness who does not speak the English language well enough to be readily understood. Such interpreter must, if he has not previously taken the constitutional oath of office, first take an oath before the grand jury that he will faithfully interpret the testimony of the witness and that he will keep secret all matters before such grand jury within his knowledge”.
Even though CPL 190.25 (3) (d) does not expressly contain the word "qualified” with respect to the appointment of an interpreter, it would be ludicrous to believe that our Legislature, in its drafting of that section, did not contemplate that the prosecutor would secure the services of an interpreter who is "qualified”.
Moreover, it would seem that our courts, by reason of sections 387 and 390 of the Judiciary Law, cannot abdicate their responsibility to see that hearing impaired persons are provided with the services of a "qualified interpreter of the deaf sign language”. Lest we forget, as the Appellate Division, Second Department, reminded us recently in People v Cade (140 AD2d 99, 101) of the fundamental "principle that Grand Juries exist by virtue of our State Constitution and the superior court which impanels them. They are not arms or instruments of the District Attorney (NY Const, art I, § 6; CPL 190.05; Matter of Additional Jan. 1979 Grand Jury of Albany Supreme Ct. v Doe, 50 NY2d 14). The manner in which the Grand Jury functions and its procedures and its duties are carefully defined by statutory provisions which are to be strictly construed (see, Matter of June 1982 Grand Jury of Supreme Ct. of Rensselaer County, 98 AD2d 284).”
Accordingly, it would seem to this court that Judiciary Law §§387 and 390 and CPL 190.25 (3) (d) must be construed together as necessitating the appointment of a "qualified” *111 interpreter here, competent after inquiry into the specific sign language methods and level of communications skills understood by the two profoundly hearing and speech impaired witnesses who testified before the Grand Jury proceeding under examination here.

The CPL 210.20 (1) (c); 210.35 (5) hearing

At the hearing inquiring into match-up of interpreter Anna Mazzeo and the two Grand Jury witnesses, the testimony in summary revealed Dr. Thomas Whalen had been the supervisor of the Lexington School for the Deaf, since September 1975. He supervised both Grand Jury witnesses while they were students at that school. Concerning their level of communication, he indicated that witness David Mendez’s reading and writing ability in English was equal to that of a second grader. That he functions primarily with a combination of American Sign Language, gestural language and English. In order to be understood, Mendez would need a sign language interpreter who understands how to interpret in a combination of Sign English and American Sign Language, and who is sensitive enough to check throughout the proceeding to make sure that David understands what is going on.
Dwayne Banks, the other witness, functions at slightly below the communication level of David Mendez. His ability in both English reading and writing would be that of a second grader. His communication skills would be primarily through American Sign Language with more gestural language and less reliance on English than David Mendez. Any interpreter for Banks would have to know American Sign Language combined with a gestural system which may be unique to Banks.
Carl Chopinsky, for 15 years a highly qualified professional sign language interpreter in the court system, had worked with and observed Anna Mazzeo on approximately 50 to 60 occasions. He indicated that Ms. Mazzeo relies almost exclusively on "Home Signs”.
Because of her inadequacies as a court sign language interpreter, he has been called upon to replace her on a number of occasions at the request of the court system. In his opinion, Ms. Mazzeo cannot use average normal American Sign Language. Ninety per cent of her interpretation is through finger spelling or using the manual alphabet. Her skill is one level or dimensional and does not vary according to the communication level of the client. She is not certified or registered for *112 sign language interpreting work, nor to his knowledge, is any longer employed in the court system. He concluded that she is not qualified to interpret for someone with minimal language skill ability.
Anna Mazzeo, the interpreter whose sign language skill was in question, learned sign language in her home. She has used this sign system for approximately 55 years. She has no training or certification as an interpreter in any mode of sign language communication. Although employed as an Italian interpreter in the courts, she has not been used in the court system for the past 2 Vi years as a sign language interpreter. She recalls doing finger spelling without problem during the Grand Jury session in question, although she has been, in the past, told that she cannot interpret sign language before a Grand Jury. She seems unfamiliar with the various forms of modern sign communication or the basic classifications of persons requiring sign language assistance. She has not been screened nor certified as a sign language interpreter by any organization and has been barred from sign language interpreting in almost all the courts in the New York City metropolitan area. As to the communication levels of the two Grand Jury witnesses here, Ms. Mazzeo indicated she was not qualified to determine what level of competence in sign language either witness possessed.
REEXAMINATION OF GRAND JURY MINUTES
Consideration of relevant law and the hearing testimony required a reexamination of the Grand Jury minutes. Such examination indicated that no advance effort was made to ascertain the method and/or level of sign language communication skills possessed by the witnesses or that they comprehended the oath that was administered to them. Further, many of the answers to simple narrative questions seem unclear, jumbled and unresponsive. In addition, the Grand Jury minutes do not reveal any rechecking of facts or understanding of concepts as indicated by Dr. Whalen as being essential to a full understanding by persons who are functioning at a second grade level or with minimal language skill ability.
STANDARDS OF "COMPETENCE” OR "QUALIFICATIONS” FOR COURT USE
This court’s research indicates that no formal rule or regu *113 lotion by the New York State Unified Court System in determining the "qualification” of a sign language interpreter (or for that matter, any kind of interpreter) as required by Judiciary Law §§ 387 and 390 exists. In place of such regulation, at least in most New York City courts, is the informal reliance upon securing sign language interpreters for court assignments through the placement service of the New York Society for the Deaf.[3]
It would seem that a fair and equitable procedure for Unified Court System adoption would be that all sign language interpreters, regardless of where they are secured, for court proceeding, be either RID certified (The Registry of Interpreters/For The Deaf — a National Membership Association of 814 Thayer Avenue, Silver Spring, Md 20910-4589) or have passed the minimum competency screening required by the New York State Office of Vocational Rehabilitation. Such a minimum procedure would have eliminated the problem herein as Ms. Mazzeo has continually refused to seek such certification or undertake such competency screening.
CONCLUSION
This court therefore, based upon its inquiry, concludes that although Ms. Mazzeo may be a highly skilled interpreter in the Italian language and its varied dialects, and is used as such in our court system, she is not qualified to render sign language interpreting services in legal proceedings as contemplated by sections 387 and 390 of the Judiciary Law and CPL 190.25 (3) (d).
Accordingly, defendant’s motion to dismiss is granted to the extent of dismissing the indictment on the grounds that the use of an incompetent interpreter may have been prejudicial to the defendant and in violation of defendant’s right to due process of law. The dismissal is granted with leave to the *114 People to re-present to another Grand Jury, if they deem such action advisable (CPL 190.75 [3]; 190.80).
Postscript: This court, since this decision was orally issued, has been advised that the District Attorney’s Office, upon evaluation of all aspects of this case, has decided not to appeal or re-present this matter to another Grand Jury. This court believes that the interests of justice have been served by this action.

. According to a study of Schein and Delk, The Deaf Population of the United States (Natl Assn of the Deaf, Silver Spring, Md [1974]), and based upon the 1970 U.S. Census, there are 21.2 million persons in the U.S.A. who are hearing impaired, with approximately 346,000 to 2 million classified as being severely or profoundly deaf. Of that number, at least 200,000 or more require specialized schooling or instruction.
For general information about "speech intelligibility”, see Barefoot, Deafness and Communication, ch 14 (Speech Improvement by the Deaf Adult; Meeting Communicative Needs), at 209, 211 (Williams & Williams, Baltimore, Md [1982]), and as to a specific study correlating "speech intelligibility with degree of deafness and other factors,” see Wolk and Schildroth, Deaf Children in America, ch 7 (Deaf Children and Speech Intelligibility — A National Study), at 139-159 (College-Hill Press, San Diego, Cal [1986]).

. For basic information about deaf culture, see Higgins, Outsiders in a Hearing World (a Sociology of Deafness) (Sage Pubis [1984]); Quigley and Kretschmer, The Education of Deaf Children (Issues, Theory and Practice) (University Park Press — Baltimore, Md [1982]); Holm, Deafness: Common Misunderstandings, at 1910-1912 (Am J of Nursing [Nov. 1978]).

. New York Society for the Deaf provides interpreter referral services to Family, Civil and Small Claims, Criminal, Criminal Supreme and Federal Courts in all of the five boroughs of New York City. In 1988, that society provided over 3,000 hours of court interpreting with a total of 645 requests from the various courts. State-wide, that agency provided approximately 48,000 total hours of interpreting services to the courts, government offices, and the private sector. All of the interpreters that work through that society’s Interpreter Referral Office are free-lance. In order for an interpreter to be registered with that office, the interpreter must either have received the RID certification or have passed the minimum competency State screening required by the Office of Vocational Rehabilitation.