*394 OPINION OF THE COURT
Karen K. Peters, J.
LISTEN
"There is a knocking in the skull,
An endless silent shout Of something beating on a wall,
And crying, Let me out.
That solitary prisoner Will never hear reply,
No comrade in eternity Can hear the frantic cry.
No heart can share the terror That haunts his monstrous dark;
The light that filters through the chinks No other eye can mark.
When flesh is linked with eager flesh,
And words run warm and full,
I think that he is loneliest then,
The captive in the skull.
Caught in a mesh of living veins,
In cell of padded bone,
He loneliest is when he pretends That he is not alone.
We’d free the incarcerate race of man That such a doom endures Could only you unlock my skull,
Or I creep into yours.” (Ogden Nash.)
The question before the court is simple — have we heard the frantic cry of a child? The answer is far from simple.
On November 25, 1991 the Department of Social Services brought an application before the Family Court, County of Ulster for an order pursuant to section 1029 of the Family Court Act to restrict contact between Mark and Laura S. and their 16-year-old daughter, Jenny. A temporary order was entered by Judge Mary Work. Subsequently, the Department of Social Services requested an order of removal. The hearing was held before this court.
This matter concerns alleged sexual abuse of Jenny by her *395 father. Jenny is a nonvocal autistic child. The child allegedly disclosed the abuse through a method of augmentative communication known as "facilitated communication.” The court held a preliminary hearing to determine the admissability of the alleged statement made through the use of facilitated communication. This hearing consumed approximately seven days of testimony.
All parties have been represented by highly competent counsel who have assertively and articulately propounded their positions on this most important issue. Research of counsel and the court indicates that this is a case of first impression, not just in New York but in these United States and, quite possibly, the world.
Petitioner called Rhonda Blumenthal, Susan Glickman, David Freschi, Daniel Crimmins, Ph.D., Cynthia Sheehan, Ph.D., Mary Winston Morton, Mary Darragh McLean, and James Weisman, Esq.
The respondent called Bernard Rimland, Ph.D., Catherine Lord, Ph.D., and Bennett Leventhal, M.D.
Petitioner seeks to introduce Jenny’s alleged statement into evidence pursuant to section 1046 of the Family Court Act. Section 1046 (a) (vi) specifically provides that previous statements made by a child relating to allegations of abuse and neglect are admissable in evidence. The issue before the court is whether the child herself made a statement.
Autism is a pervasive developmental disorder with onset in infancy or childhood. Jenny’s diagnosis as autistic has not been challenged. The diagnosis of autism is based upon criteria as set forth in DSM-III-R. While proponents of facilitated communication question the present validity of the diagnostic criteria as set forth in DSM-III-R, this court finds as a matter of law that those criteria should be considered unless or until appropriate scientific testing determines that they are not relevant to the diagnosis of the disorder. An individual suffering from autism exhibits a qualitative impairment in reciprocal social interaction, qualitative impairment in verbal and nonverbal communication, as well as imaginative activity and a markedly restricted repertoire of activities and interests.
As noted by Douglas Biklen, Mary Winston Morton, and others in their article I amn not a utistivc on thje typ (I’m not autistic on the typewriter) as reported in 6 (No. 3) Disability, Handicapped in Society (1991), "the communicative difficulties of people with autism may include pronoun reversals, repetí *396 tive (perseverative) speech, difficulties with social interaction and with the use of language in social situations, seeming need for sameness including a demand for particular words in particular situations, lack of response to external events, including noises, muteness and echoalia.” Professor Biklen and the proponents of facilitated communication contend that many individuals suffering from autism are able to communicate and show unexpected literacy through the use of facilitated communication. Dr. Biklen’s findings are not universally accepted by those individuals involved in diagnosing and treating autistic persons.
Facilitated communication is a method developed by Rosemary Crossley and her colleagues at the Dignity through Education and Language Communication Center Deal in Melbourne, Australia, during the 1970s. Initially, Ms. Crossley developed the method to assist individuals with cerebral palsy. The provision of physical support, i.e., hand or arm support, enabled those individuals to achieve greater control over their movements. Thereafter, Ms. Crossley applied the method to nonverbal individuals with autism. Facilitated communication is a training method, purportedly appropriate for individuals who are not yet able to communicate independently and meaningfully, but for whom meaningful, independent communication is a realistic and desirable goal.
The basic elements of the method include the use of a communication aid, i.e., letterboard, keyboard or typewriter, and the provision of physical support to the individual’s arm by a facilitator. The facilitator’s function is not to guide the individual toward a letter but instead provide resistance to the writer’s forward motion. The facilitator then pulls the arm back to center after each selection. Because each disabled individual has his own unique disability, behavior, style of communicating and personality, the method is not uniform in its application from individual to individual.
Facilitated communication is one method within the broad field of augmentative communication. It utilizes teaching skills and methods that are regularly used by special education teachers who teach disabled individuals and typical teachers teaching typical children. The facilitator must provide physical support, emotional support, encouragement and assume competence of the student.
The first reported independent study of the validity of facilitated communication was conducted in Australia in 1989. *397 That State government inquiry entitled “Investigation into the Reliability and Validity of the Assisted Communication Technique” was conducted by the intellectual disability review panel. Its findings were contained in a report to the Director General on the reliability and the validity of assisted communication in March of 1989. The Director General of the Department of Community Services of Victoria had referred to the review panel for investigation the matter of the validity and reliability of a communication technique referred to as assisted communication which was widely used and promoted by an organization called DEAL. The Director General sought the advice of the review panel in many areas. Of particular importance was a request that the panel develop and apply a method to determine the validity and reliability of communication which occurs using the technique.
According to their report to the Director General, the methodology developed by the review panel using a number of controlled conditions was found to be an appropriate method for establishing the reliability and validity of the assisted communication technique being tested and specifically for determining whether the assistant influenced the communication and whether the client’s communication was valid.
According to this study they had difficulty acquiring the cooperation of DEAL but were able to study assisted communication with six individuals.
In assessing the reliability and validity of assisted communication they determined that the validity of the communication was demonstrated in four of the six clients who participated in this study. They did note, however, that only the controlled study could determine whether an assistant was influencing the communications. They found that in all three cases of the controlled study, the response of the client was influenced by the assistant. They also noted that the assistants appeared to be unaware of their influence upon specific clients. The report determined that neither major position in the dispute was wholly supported. That is, they found that some communications were valid and reliable through assisted communication without influence by the assistant and others were clearly influenced by assistants.
Douglas Biklen, in his article Communication Unbound: Autism and Praxis, discussed a qualitative study which he conducted. He demonstrated that people who have been labeled severely autistic selectively communicate with certain *398 facilitators in certain circumstances. (Harvard Educ Rev, DOL 60, No. 3 [Aug. 1990].)
As noted by the Law Guardian, individuals who undergo brief training in order to become facilitators are specifically required to assume competence of the child or adult being facilitated. Often, the facilitator physically manipulates the hand of the individual being facilitated. In some situations, the facilitator may be able to "fade” so that the physical contact between the facilitator and the individual being facilitated is minimized. The type of physical assistance provided to the person being facilitated could well be a relevant factor in determining the suggestibility of the procedure.
APPLICABILITY OF FRYE V UNITED STATES
Counsel for respondents contend that a Frye hearing was necessary to determine the admissability of the alleged statement. (Frye v United States, 293 F 1013.) Counsel for petitioner contends that facilitated communication is not a scientific method and therefore the general rule governing admissability of scientific evidence does not apply. She further argues that if the court determines that facilitated communication is subject to the Frye test, this court should determine that it has passed from the state of experimentation and uncertainty to that of reasonable demonstrability.
As noted by the Law Guardian in her memorandum of law, the difficulty this court faces in Jenny’s case is distinguishable from each and every decision of any trial court that has been reported in that the issue is not the admissability of scientific evidence to assist the court in determining the credibility of a witness or the validity of a witness’s statement but rather whether in fact a statement exists at all.
Counsel for the petitioner argues that facilitated communication is a mode of assisted or augmentative communication which does not fall within the Frye rule. Counsel for respondents contends that Frye is relevant and that the court must determine whether or not facilitated communication is generally accepted as a valid means of communication. Frye v United States (supra), adopted in New York, relates to "scientific evidence” and sets forth a standard of admissability that is generally utilized in criminal matters. That standard is that scientific evidence will only be admitted at trial if the procedure and results are generally accepted as reliable in the scientific community. Numerous cases have been decided by trial courts as well as appellate courts concerning the applica *399 bility of Frye to scientific evidence. Recently, many Judges have distinguished between "hard” scientific evidence which is duplicable in a laboratory, such as DNA evidence, and "soft” scientific evidence, such as battered child syndrome, which relies heavily on interpretation.
The issue in Frye (supra) concerned the admissability of the systolic blood pressure deception test, commonly known as the lie detector test. The court determined that the test had not yet "gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made” (at 1014). In its decision the court noted that, while trial courts will go a long way in admitting expert testimony which had been deduced from well-recognized scientific principles or discovery, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs” (at 1014). They characterized the stage between experimental and demonstrable as the "twilight zone”. That twilight zone is where this court is presently forced to focus.
The "statement” of Jenny cannot be admitted into evidence without testimony concerning the technique used to acquire the statement. Jenny did not merely sit at a typewriter or computer keyboard alone, without any assistance, and type words which could be considered to be a statement. Rather, she was assertively assisted in that communication by an individual who has been called a "facilitator.” In order to admit the alleged statement of the child this court must determine if facilitated communication is generally accepted in the scientific community as a reliable method of communication. The basic problem with admitting facilitated communications is the determination as to whether the facilitator, in aiding in a communication, creates an inherently suggestive procedure. There is no question that the power of suggestion, if found, would not effect all people to this same extent and indeed may have no effect on some. A similar controversy faced the Court of Appeals in the matter of People v Hughes (59 NY2d 523). Chief Judge Wachtler in rendering the decision explained that the center of the controversy was a question as to whether the general rule governing the admissability of scientific evidence applied to hypnotic recall. At the time of his decision there was general agreement among the courts that the Frye rule applied to and rendered inadmissable *400 statements which were made by a witness under hypnosis if those statements were offered for the purpose of verifying the truth of the witness’s testimony at trial. But many cases had been heard subsequently on a question slightly different. That question as determined by the Court in Hughes (supra) was if hypnosis had been employed to refresh or restore the memory of a witness, whether the witness could testify at all after such hypnotic refreshing of her recollection. The Court determined that the Appellate Division correctly held that the trial court should not have permitted the victim to testify to events recalled only after hypnotic sessions. The Court did not, however, determine as a matter of law that pretrial use of hypnosis necessarily rendered the witness incompetent to testify to events recalled prior to being hypnotized. The Court determined that a hearing should be held to establish the extent of the witness’s unaided recollection and that proof should be introduced as to the procedures taken to reduce the risk of impermissible suggestiveness.
In fashioning its remedies, the Court admitted that it was attempting to make a reasonable accommodation between the legitimate use of hypnosis and the defendant’s right of confrontation. That Court’s efforts to reach a reasonable accommodation are quite relevant to the problem before this trial court.
The issue of the admissability of a polygraph test was dealt with by the New York Court of Appeals in People v Leone (25 NY2d 511). Judge Jasen, rendering the decision in 1969, noted that while most jurisdictions would not admit the polygraph as probative evidence of truth, they would accept it for the limited purpose of corroborating or impeaching other evidence. The issue of whether facilitated communication "statements’’ are admissable for the purpose of corroboration or impeachment is not before this court. This case is seeking to admit the statement as evidence-in-chief. Judge Jasen noted that some States permit the Judge to exclude the results of a polygraph if the Judge is not satisfied with the competence of the examiner. Clearly the qualifications of the examiner are always at issue no matter what type of scientific evidence is sought to be introduced. The Leone Court specifically noted ”Although perfection in test results is not a prerequisite to the admissibility of evidence obtainable [through] the use of scientific instruments, the rule has been to grant judicial recognition only after the instrument has been sufficiently *401 established to have gained general acceptance in the particular field to which it belongs” (at 517).
Frye (293 F 1013, supra) has also been held applicable to expert testimony which may be considered soft scientific evidence. In People v Williams (6 NY2d 18, cert denied 361 US 920 [1959]), the issue before the Court concerned the admissability of expert testimony to the effect that narcotic addicts are unworthy of belief. The Court refused to admit the testimony in the absence of clear and convincing evidence to the effect that such opinion was the consensus of the medical and scientific community.
The Frye rule has also been held applicable to and the basis of admitting expert testimony regarding rape trauma syndrome (People v Taylor, 75 NY2d 277 [1990]). Other syndrome-type testimony has been admitted in Matter of Nicole V. (71 NY2d 112 [child sexual abuse syndrome]), People v Keindl (68 NY2d 410 [psychological reactions of sexually abused children]) and People v Henson (33 NY2d 63 [battered child syndrome]).
As noted by the Court of Appeals in People v Middletown (54 NY2d 42), the question before the Court in determining the admissability of scientific evidence is not a determination as to whether a particular procedure is unanimously endorsed by the scientific community but rather whether that procedure is generally accepted as reliable.
Judge Damien Amodeo of the Family Court of the County of Dutchess rendered a decision on the admissability of validation testimony in the matter of the Department of Social Servs. (Frederick) (Mar. 1, Sept. 4, 1991). The issue before that Judge concerned the admissability of the opinions of an alleged expert validator in the area of intrafamilial child sexual abuse syndrome. Respondent contended that the validator’s protocol was not scientifically reliable. Upon holding a Frye hearing, the court noted that since the opinion was sought to be utilized specifically for the purpose of corroborating a statement the degree of reliability demanded by the court could be somewhat less than when the validation evidence is relied upon as the sole source of corroboration.
In United States v Jakobetz, the United States Court of Appeals for the Second Circuit discussed a three-pronged test which many courts have adopted since the Frye rule. (955 F2d 786.) The matter before that court concerned the admissability of DNA evidence in a criminal proceeding. The appellate court *402 reminded readers that the Frye court had assumed that general acceptance indicated reliability and that only reliable evidence should be admissable. They reviewed recent decisions of trial courts which had created an "elevated” standard including People v Castro (144 Misc 2d 956) and United States v Two Bulls (918 F2d 56, reh granted 925 F2d 1127 [Feb. 21, 1991], reh vacated and appeal dismissed 925 F2d 1127 [Apr. 18, 1991]). The three-pronged test is similar to the Frye test in that the first two prongs are standards already embedded in Frye (supra): (1) whether a theory exists that is generally accepted in the scientific community and that supports the conclusion that DNA forensic testing can produce reliable results; (2) whether techniques or experiments currently exist that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific communities; and (3) whether the testing laboratory in the particular case performed the accepted scientific techniques in analyzing the forensic samples. In quoting United States v Two Bulls, the Court of Appeals noted that because DNA evidence was so new and the resulting prejudice to the defendant so great, it was imperative that the court satisfy itself that there existed a sufficient foundational basis as to the over-all admissability of the evidence.
The court’s decision in Jakobetz (supra) is quite relevant to the issue before this trial court. This court must determine whether facilitated communication is generally accepted in the scientific community and produces reliable results, whether techniques or experiments currently exist that are capable of producing reliable results which are generally accepted within the community and whether the facilitator can perform his or her function in compliance with those standards.
The validity and reliability of facilitated communication has been studied by experts and laypersons alike. This court finds as a matter of law that for the purposes of determining the admissability of the alleged statement of Jenny, the Frye standard is applicable.
In determining the admissability of the alleged statement under Frye (supra) the court must first determine the scientific community to which the technique must gain general acceptance. As noted by the court in People v Quinn (153 Misc 2d 139) there are specific problems with the Frye standard when a specialized community is called upon to judge whether a procedure has become accepted. This is particularly the case if *403 the community is narrowly drawn. In essence the scenario can become one in which the consensus judgment mandated by Frye becomes illusory in that the opinion of a few experta could constitute the judgment of a scientific community. This court has scrupulously sought to avoid that potential outcome. This court finds that the relevant scientific community includes physicians, psychologists, psychiatrists, educators, neurologists, and speech and language pathologists.
This court is not concerned as to whether facilitated communication is a useful teaching technique. Clearly the standards by which educators would determine the appropriate use of facilitated communication would not necessarily require that substantial reliability be proven. As the Law Guardian notes, the Court of Appeals in People v Hughes (59 NY2d 523, supra) conducted an analysis of hypnotically aided recall in which they concerned themselves with the use of such recall for particular purposes. For example, the Court mentioned that hypnosis was accepted within the scientific community for medical use and criminal investigations. That did not necessarily mean, however, that the use of such method was a sufficiently reliable means of restoring recollection to permit it to be admitted into evidence in court.
This court is not unmindful that trial courts in the area of family law differ as to the admissability of polygraph evidence. (Matter of Smith, 133 Misc 2d 1115 [Fam Ct, Queens County 1986], affd 128 AD2d 784, lv denied 69 NY2d 613; Matter of Meyer, 132 Misc 2d 415 [Fam Ct, Kings County 1986].) In admitting polygraph evidence the trial court in Matter of Meyer distinguished between "soft evidence” and "hard evidence.”
The applicability of Frye (293 F 1013, supra) to "soft evidence” is clearly before this court. Therefore, People v Burton (153 Misc 2d 681) is relevant as well. In that case the defendant was accused of matricide. At trial he attempted to introduce the testimony of a psychiatrist on the theory of "acute grief.” The People moved to preclude. It was argued that " 'soft’ scientific evidence” should have an alternative test other than that as set forth in Frye. Determining whether the Frye test should apply to "soft scientific evidence”, a type of evidence for which even that court agreed it had not been originally developed, was noted as yet an open question for both courts and commentators. The court was unpersuaded by efforts to admit the theory, contending that adherence to scientific investigation must be shown prior to admitting the *404 theory. The court found that the collection of a database, its analysis, and the analytical framework for interpreting results, which are hallmarks of the scientific method and used to minimize the possibility that bias would affect conclusions, were sorely lacking.
Petitioner has propounded the testimony of Cynthia Sheehan, a psychologist who was deemed an expert in clinical psychology and special education. According to Dr. Sheehan, she had initiated research to determine the validity of facilitated communication. By her own testimony, they first designed an experiment and later abandoned it because they felt it was inappropriate for the subject matter they were investigating. She advised that the study was abandoned "because we would not withdraw the facilitation within the context of the relationship we had developed with those children within their special education settings”. Dr. Sheehan’s study, which has changed focus from quantitative to qualitative, has neither been completed nor reported.
Dr. David Freschi testified that he is working with psychologists to design a research project to investigate the validity and reliability of facilitated communication. By his own testimony, Dr. Freschi stated that he did not believe facilitated communication was generally accepted within the scientific community.
Respondent propounded the testimony of Dr. Bennett L. Leventhal. Dr. Leventhal’s credentials, like those of most of the witnesses called by both parties, are impeccable. Dr. Leventhal echoed the testimony of Dr. Rimland and Dr. Lord, the other expert witnesses called by respondent in rendering an opinion to the effect that facilitated communication was not generally accepted within the scientific community as a valid communication modality. He testified that the burden of responsibility proving the validity of a modality of communication rests upon the proponents of that modality. Dr. Leventhal described that as an individual involved in research and diagnosis in the field of autism he, like other professionals, has a responsibility to the community of individuals concerned with autism similar to the responsibility any scientist has to the citizenry. He believes it necessary that before a particular type of treatment is used he should be confident that the treatment is not only safe but also effective. Dr. Leventhal testified that he had not seen any studies published concerning facilitated communication which he would consider sufficient to determine the validity of the method.
*405 In discussing his concerns for the use of facilitated communication before appropriate studies are conducted, he used an example of a study with a drug called fenfluramine. According to Dr. Leventhal an investigator at UCLA gave four children this drug which had previously been available to treat persons to lose weight. According to the researchers the boys who were suffering from autism showed astounding effects from the drug in that their LQ.’s doubled and their autism symptoms dropped dramatically. The study published in the New England Journal of Medicine led to a high run on this drug in drugstores as parents of autistic children were attempting to get access to the drug for their own children. A subsequent double blind study showed that the drug was not successful.
Dr. Leventhal explained that the parents of autistic children are often desperate. He commented in part "not because the kids are awful * * * because of the nature of the disability * * * the stress that it causes on families * * * those of us who have children, to have your child responsibly giving a hug or a kiss, and be able to say I love you, and have a true sense of it, is the best thing that can happen to us. It is very rare that an autistic child can do that. You are missing that kind of nuance and subtlety. The sense of interaction. You get desperate, because you want to make it happen more than anything in the world * * * So, when something comes along and says, the kids will get twice as good as they were before— you know — its like they are desperate. They are crying for it.”
Dr. Leventhal was of the opinion that anecdotal information allegedly confirming the validity of facilitated communication is insufficient to assess the reliability and validity of such communication. He did testify that he and his colleagues are beginning to put together a study to assess the reliability and validity of this technique.
All of the factors found acutely lacking by the trial court in Burton (supra) are lacking in this case as well. Facilitated communication has not passed from the stage of experimentation and uncertainty to that of reasonable demonstrability. The hallmarks of the scientific method have not been shown to this court so as to ensure that bias will not affect the conclusion.
Petitioners have failed to provide the court sufficient evidence of testing in order to determine the reliability and validity of facilitated communication.
*406 SIMULTANEOUS TRANSMISSION
Counsel for petitioner contends that facilitated communication is a simultaneous transmission from written English to spoken English and that therefore Frye (293 F 1013, supra) does not apply. She contends that an analogy can be drawn to individuals who are interpreting for the deaf through American sign language.
According to Mary Darragh McLean, a certified interpreter of American sign language called by petitioner, American sign language does not involve a literal translation but rather requires that translators impose their judgment and knowledge on the subject matter and, when appropriate, change syntax, add words based on content, and, in certain circumstances, add to the content of a question or answer. According to Ms. McLean, American sign language (ASL) is generally used in court proceedings as opposed to exact English which is a word-for-word translation. It should be noted that the use of interpreters for the deaf in court proceedings has been recognized by statute and, in fact, such interpreters must be certified to provide such service to the court. (Judiciary Law § 390.) Daniel Crimmins, called by petitioner, contends that facilitated communication is not a translation but merely a transition of communication from one modality to another. However, petitioner’s witness Rhonda Blumenthal admitted that as a facilitator she will edit out typographical errors and potentially impose nouns or pronouns based upon content.
In support of its argument that the facilitator is not interpreting but merely transmitting, petitioner cites People v Guzman (125 Misc 2d 457, affd 76 NY2d 1) and People v Miller (140 Misc 2d 247). Petitioner contends that since the facilitator is merely a transmitter the only question before the court is the qualification of the facilitator which, of course, should be dependent upon the facilitator’s expertise and ability to understand the witness.
Petitioner’s reliance upon sign language interpreters is, by the testimony of petitioner’s own witness, misplaced. Daniel Crimmins, called by petitioner, discussed the type of research that had been done to establish the use of sign language as a valid modality of communication. He testified that research on sign language "goes back probably one hundred and fifty years in terms of formal communication.” He testified that the research involves validation in the process of communication. He did admit that the research begins by descriptive studies, *407 but that is not the end of the inquiry. Dr. Crimmins testified that in determining the validity of a modality of communication one might well begin with observation, move to qualitative research and then to quantitative research.
Dr. Crimmins described differing types of augmented communication devices. They are often used in educational settings for persons suffering from disabilities. Those devices include devices as simple as a key ring which has six pictures on it which an individual who is unable to verbally communicate can show to another person to reveal their wishes. For example, the key ring could have a picture of a bathroom, a drinking cup, a swing and a school bus. According to Dr. Crimmins, tests are conducted to determine the reliability of these devices through "correspondence training.”
This court must conclude from the testimony of witnesses presented by the petitioner that there is insufficient evidence to conclude that facilitated communication is simultaneous transmission from one common modality of English to another conducted by a qualified, reliable individual. Until the validity of this modality of communication has been studied and confirmed the contention of petitioner cannot be accepted by the court.
APPLICABILITY OF THE AMERICANS WITH DISABILITIES ACT OF 1990
The Americans with Disabilities Act (ADA) (Pub L 101-336, 104 US Stat 327) enacted July 26, 1990 became effective July 26, 1992. This landmark legislation provides comprehensive civil rights protection to persons in many areas of civil life including public accommodation and State and local government services.
Petitioners assert that as Jenny is an individual with a disability subject to the protections of this Act the court must make accommodation, which extends so far that "if in this Country there exists one qualified individual with a disability who can communicate in a language known only to that individual and one other individual, the court must allow that person in and hear what she has to say.”
Petitioner is correct in asserting that the ADA is intended to enable disabled persons to enjoy equal access to our courts and may well require that auxiliary aids and sources such as computer-assisted transcripts be made available to litigants and witnesses. (28 CFR part 35.)
But petitioner’s expansive interpretation of the ADA cannot *408 be accepted by this court. While the statute requires that public entities make reasonable modifications in policies, practices and procedures to avoid discrimination on the basis of disability, it does not require that this court cast aside constitutional guarantees of due process.
Section 3 of the Act defines "Auxiliary aids and services” so as to include:
"(A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;
"(B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;
"(C) acquisition or modification of equipment or devices; and
"(D) other similar services and actions.” (42 USC § 12102 [1].)
Not only must an interpreter be qualified but if auxiliary aid or services are necessary to afford an individual with a disability an equal opportunity to access or participate in a service, the auxiliary aids or services furnished must be appropriate. So, in assessing the qualification of the "interpreter” and/or the propriety of the auxiliary aid we return full circle to the Frye test.
Clearly a communication technique or device whose reliability and validity has been proven must be provided to a disabled person to enable them to testify but facilitated communication does not fall within that category of techniques or devices.
If, in reality, Jenny is speaking, she deserves to be heard. If, as the proponents of facilitated communication contend, Jenny and thousands of other children suffering from autism are not autistic on the typewriter and can communicate with their friends, their neighbors, their teachers and most of all their family, then this court could hear Jenny. Regrettably, the proponents of this technique have failed to conduct the necessary studies to ensure the reliability and validity of this communication technique sufficiently to permit the court to accept Jenny’s alleged statement into evidence. Out of concern for Jenny and all other children who may be suffering from their inability to communicate or possibly suffering from abuse or neglect at the hands of their family, their neighbors or others, this court implores those individuals, who are able *409 to do so, to conduct the necessary studies to determine the reliability and validity of this most interesting technique. Until this is done, we will never know if there is a knocking in the skull, an endless silent shout, of something beating on a wall, and crying let me out.