In the Matter of Luz P., a Child Alleged to be Abused. ORANGE COUNTY DEPARTMENT OF SOCIAL SERVICES, Appellant; AUGUSTO P. et al., Respondents.

Second Department, March 29, 1993

APPEARANCES OF COUNSEL

*Stephen R. Hunter, County Attorney* of Orange County, Goshen *(Lewis A. Borofsky* of counsel), for appellant.

*Richard N. Lentino,* Middletown, for Augusto P., respondent.

*Jean M. Hernon, Law Guardian,* Goshen, for infant.

### OPINION OF THE COURT

SULLIVAN, J. P.

In this child protective proceeding we consider the proper course to be taken by a trial court when confronted with a potential witness who suffers from a disability in communicating. Luz P. is an 11-year-old girl who is nonverbal and has been described as both autistic and mentally retarded. She has

been enrolled in a "BOCES" special education program for the developmentally disabled in Orange County. It does not appear that Luz has any hearing defect.

In February 1992 therapists in the special education program claimed that Luz could communicate with them by means of "facilitated communication". In this process, Luz allegedly communicates by spelling out words on a keyboard while a "facilitator" supports her hand. Using this technique, the teachers contend that Luz has demonstrated an understanding of both English and Spanish and an ability to read, spell, and tell time. In the course of communicating with her teachers, it is claimed that Luz alleged that her parents were sexually abusing her. As a result of this information, the Orange County Department of Social Services (hereinafter the DSS) removed Luz from the custody of her parents on May 12, 1992. On the following day, DSS filed a petition in the Family Court, Orange County, pursuant to Family Court Act article 10 alleging that both parents had sexually abused Luz.

On May 14, 1992, the parents appeared to answer the petition in Family Court. Attorneys were appointed for each of them and a Spanish interpreter was provided. The court entered an order placing Luz in the temporary custody of the DSS. The parents have never sought the return of Luz pursuant to Family Court Act § 1028.

A fact-finding hearing was to commence on October 22, 1992, in the Family Court, Orange County. The County Attorney representing the DSS sought to call the child Luz as his first witness. When the court raised questions as to the ability of Luz to communicate, the County Attorney offered to conduct a preliminary procedure before the court so that a determination could be made as to whether Luz could in fact respond to spoken questions. The County Attorney further suggested that questions be put to Luz out of the presence of the "facilitator" to insure that the letters pointed out on the keyboard would reflect Luz's answers and not those of the "facilitator". The Law Guardian joined in this application.

Counsel for both of the respondent parents objected to this procedure and insisted that there must first be a *Frye* hearing *(Frye v United States,* 293 F 1013) to establish the validity of "facilitated communication" and its acceptance in the scientific community. The court, *sua sponte,* additionally raised the question of whether autism prevented Luz from being *sui juris,* and found that this separate issue also required expert

testimony. The attorney for the respondent father further questioned Luz's capacity to be sworn.

The court then denied the County Attorney's application to call Luz and directed that there be a *Frye* hearing as to the scientific reliability of "facilitated communication", as well as expert testimony to explore the question of whether autism would adversely affect the reliability of such "facilitated communication". The court also ruled that the DSS would have the burden of proof as to each issue. After a brief adjournment, the County Attorney advised the court that he would need to call expert witnesses from out of town to testify at a *Frye* hearing and requested an adjournment for that purpose. The Court denied the request and *sua sponte* summarily dismissed the petition. This Court stayed enforcement of the order of the Family Court and the return of Luz to her parents pending determination of this appeal. Since we find that the court legally erred in its directions regarding the preliminary hearings and improvidently exercised its discretion in dismissing the petition, we reverse the order appealed from, reinstate the petition, and remit this matter to the Family Court, Orange County, for further proceedings consistent with this opinion.

I

The capacity of a witness to observe, remember and communicate goes to the question of the competency of that witness (Fisch, New York Evidence § 261 [2d ed 1977]). All questions of competence are to be decided preliminarily by the court alone *(People v Rensing,* 14 NY2d 210; Fisch, New York Evidence § 258 [2d ed 1977]; Richardson, Evidence § 117 [Prince 10th ed]). At common law, a nonverbal or mute witness such as Luz would have been disqualified from testifying (Fisch, New York Evidence § 257 [2d ed 1977]); however, that is no longer the rule and a deaf mute, similar to a witness unable to speak English, may testify through a person who can understand and communicate with the witness *(People v McGee,* 1 Denio [NY] 19; 1 Chamberlayne, Modern Law of Evidence § 355 [1911]). Upon a showing of the need for an interpreter, the court must appoint such an interpreter. Judiciary Law article 12 authorizes the appointment of official interpreters and permits the temporary appointment of interpreters by a court where needed. The court must be satisfied that the interpreter is expert in the language used by the

witness and can communicate with the witness. An interpreter so appointed must be sworn to interpret properly and truly *(People v Fisher,* 223 NY 459).

A critical consideration in the appointment of an interpreter for a witness who does not speak in the English language is a matching of the level of communication skill of the witness with that of the interpreter *(People v McGee, supra).* When dealing with foreign languages, there are differences in dialects that could render translations unreliable or even unintelligible. Similarly, communicating with witnesses who have profound hearing and/or speech impairments can be complicated by the variety of "signing" systems that are in use. Indeed, in *People v Rodriguez* (145 Misc 2d 105, 108-109), there is a discussion of no less than eight separate communication systems used by those who are deaf and/or speech impaired. Those who use one system may not understand another. Some of these systems are used by relatively small groups and in some instances are used only within a particular family. These systems do not have any scientific underpinnings but are the result of repeated trial and experimentation, as were the pioneering efforts of the teacher Ann Sullivan with Helen Keller.

While the particular technique of facilitated communication using keyboards, etc., is a relatively recent phenomenon, the more general problem of the means by which a speech-impaired witness can communicate at a trial has been before the courts in the past *(see, People v Thompson,* 34 AD2d 561, *affd* 28 NY2d 616). Twenty-five years ago in *People v Thompson (supra),* the Supreme Court, Kings County, was confronted with a victim who was deaf and illiterate, but who was able to read lips. He did not know any sign language and communicated by making verbal sounds which could be understood by those with special training. At a trial on charges of robbery in the first degree, grand larceny in the first degree, and assault in the second degree, the People proposed that the victim's sister be sworn to act as an interpreter for the victim. The defense counsel objected to the use of a relative as a translator *(see, Matter of James L.,* 143 AD2d 533 [4th Dept, 1988]), and this objection was sustained and a speech therapist was appointed. The victim testified through the translator that he was kicked by one of the defendants and that a sum of money was taken from his person. In addition, two detectives testified that they saw a group of people going through the pockets of the victim while he was on the floor of a hallway. As the

detectives approached, the group ran from the hallway but the defendant was caught. The jury acquitted the defendant of the robbery and assault counts, but convicted him of attempted grand larceny in the first degree as a lesser included count.

On appeal to this Court, the defendant argued that the victim's translated testimony should have been stricken because it was unreliable and hindered effective cross-examination. However, we disagreed upon finding that the defendant was not prejudiced by such testimony, since it appeared that the jury, in acquitting on the robbery and assault counts, had either not comprehended or not credited the victim's testimony. We further found that the independent testimony of the detectives was legally sufficient to support the verdict as to attempted grand larceny in the first degree *(People v Thompson,* 34 AD2d 561, *supra).* The same defense argument was made and rejected in the Court of Appeals, which affirmed on our opinion *(People v Thompson,* 28 NY2d 616, *supra).*

More recently in *People v Miller* (140 Misc 2d 247), the City Court of Rochester permitted a 52-year-old victim, who suffered from cerebral palsy and who communicated in seemingly incomprehensible mumbles, to testify with the assistance of a speech therapist. The court pointed out that since the victim in that case (like Luz in the matter before us) did not communicate in a foreign language, the therapist was not truly a translator or interpreter but was a transmitter who would convey the victim's responses word for word. At a preliminary hearing, the court satisfied itself that the therapist had the ability to communicate with and understand the victim and that she would give a literal, word-for-word repetition of his responses. Hence, the *Miller* court determined that the two-pronged requirement for the appointment of an interpreter had been met *(see,* Richardson, Evidence § 476 [Prince 10th ed]; Fisch, New York Evidence § 328 [2d ed 1977]; *People v Fisher,* 223 NY 459, *supra).*

The test for the court in cases such as these is a pragmatic one. Can the interpreter, or in this case the facilitator, effectively communicate with the witness and reliably convey the witness's answers to the court? A determination of these questions does not require expert testimony. To the contrary, the proffered facilitated communication lends itself to empirical rather than scientific proof. Thus, the test proposed by the County Attorney, whereby the court could question Luz outside the presence of the facilitator and then hear her respon-

ses through facilitated communication, should adequately establish whether this is a reliable and accurate means of communication by Luz. Fact-specific questions can be devised which should demonstrate whether the answers are subject to the influence, however subtle, of the facilitator. If the court is satisfied from this demonstration that the facilitator is "qualified" to transmit communications from Luz to the court, then the facilitator may be appointed as an interpreter under Judiciary Law article 12 *(People v Catron,* 143 AD2d 468).

## II

We turn now to a further consideration of whether the facilitated communication proffered here must satisfy the requirements of the *Frye* test *(Frye v United States,* 293 F 1013, *supra).* The rule laid down in *Frye* provides that scientific evidence will only be admitted at trial if the procedure and results are generally accepted as reliable in the scientific community *(People v Hughes,* 59 NY2d 523, 537). The Family Court refused to permit Luz to testify with the aid of facilitated communication without persuasive evidence establishing that facilitated communication is based on an accepted scientific theory. The court further held that the DSS, as the proponent of the use of facilitated communication, had the burden of demonstrating its scientific accuracy and acceptance. This was error.

As we have indicated above, since the ability of an interpreter, translator, "signer", or anyone else who transmits the testimony of a witness is not based on a scientific theory, any application of the *Frye* test is inapposite. Clearly, no *Frye* test was appropriate or necessary before a Spanish interpreter was provided for Luz's parents, the respondents in this proceeding. Indeed, there was not even an attempt made on the record to determine which dialect of Spanish the respondents spoke. It was enough that the interpreter and the respondents could understand each other and that the interpreter swore to translate accurately. There is no present requirement, nor has it ever been considered necessary in the past, to establish that translation from Spanish to English and vice-versa must have a scientific basis. Inasmuch as such a preliminary showing is not necessary with regard to the interpreter and the respondent parents, there is similarly no basis for concluding that the presentation of expert scientific evidence is necessary with respect to Luz's facilitator, who would only assist her in

communicating her responses to the court and would not translate any of the questions put to Luz.

In rendering its determination, the Family Court in this case principally relied upon the decision in *Matter of Department of Social Servs. [Jenny S.] v Mark S.* (156 Misc 2d 393). However, because of the different procedural issues involved in the case before us, that decision is of scant relevance to the present controversy. Indeed, in *Jenny S. (supra),* the court was asked to determine the admissibility of an out-of-court statement purportedly made by the child rather than her proffered testimony at trial. The court did not see the child or know first hand if the facilitator could communicate with her, nor was the facilitator sworn to provide a literal, word-for-word rendering of the child's responses. Conversely, here we are dealing with the prospective testimony of a live witness who is to be placed before the trier of the facts and subjected to cross-examination.

Moreover, even as to out-of-court statements, *Jenny S. (supra)* appears to be of questionable value. The better position, in our view, is set forth by our colleagues in the Appellate Division, Third Department, in *Matter of Marshall R.* (73 AD2d 988). In that case, the Appellate Division reversed the dismissal of a child abuse and neglect petition because the Family Court ruled that an out-of-court statement made by a six-year-old deaf child could not be testified to by an interpreter for the deaf. In language that is equally applicable to this case, the Court observed: "The best interests of the child are far more important than some technical objection which, on this record, appears to have little substance. The testimony of the interpreter should have been admitted, and then it would become the duty of the court to weigh and evaluate such testimony in the light of the circumstances under which it was given". *(Supra.)*

### III

■ The respondents additionally argued before the Family Court and on this appeal that expert testimony would be required both as to Luz's competency to testify in light of her autism and as to the susceptibility of her testimony to manipulation by the facilitator. The Family Court similarly expressed its desire for expert testimony in these areas in connection with its ruling on the applicability of the *Frye* test.

Quite clearly the court must be satisfied that the testimony

as transmitted by facilitation is in fact the testimony of Luz herself, uninfluenced by the facilitator. However, as previously noted, the test proposed by the County Attorney should enable the court to come to a reasoned conclusion as to the reliability of the facilitator without the necessity of expert testimony. If the court is not convinced that the facilitator is reliable, then that facilitator may not serve as the interpreter. However, such a finding should not foreclose Luz from testifying if a reliable facilitator can be found elsewhere. The DSS will of course have the burden of establishing the reliability of the facilitator at the preliminary proceeding.

Furthermore, the fact that Luz has been diagnosed as autistic and classified as retarded does not preclude her from testifying "provided [she] understands the nature and obligations of the oath, and provided, also, [she] possesses the capacity to give a correct account of what [she] has seen or heard in reference to the question at issue" (Richardson, Evidence § 389, at 367 [Prince 10th ed]). Again, this challenge must be decided by the court preliminarily (see, *Rittenhouse v Town of N. Hempstead,* 11 AD2d 957). To this end, the court may examine not only the proposed witness, but anyone else who can aid in the resolution of the issue (see, *Aguilar v State of New York,* 279 App Div 103). However, inasmuch as proposed witnesses are presumed competent (see, *People v Parks,* 41 NY2d 36, 45; Richardson, Evidence §§ 385, 389 [Prince 10th ed]), it will be the burden of the respondents to demonstrate that Luz lacks the capacity to testify by reason of her autism or purported mental retardation.

Finally, it should be remembered that these various inquiries involve separate and discrete determinations (e.g., whether the facilitator is accurate and reliable; whether the facilitated testimony is a literal word-for-word rendition of the witness's responses; whether the witness's autism constitutes such a mental impairment as to render her incompetent to testify; whether she can understand the meaning of an oath, etc.) which the court must make after a preliminary hearing. Critical to the resolution of these issues is the question of whether Luz can reliably communicate with the assistance of a facilitator. The Family Court erroneously denied the DSS an opportunity to present relevant evidence on this fundamental issue and improperly dismissed the proceeding *sua sponte.* Accordingly, there must be a reversal.

For the reasons set forth above, the order dismissing the proceeding is reversed, and the matter is remitted to the

Family Court, Orange County, for further proceedings consistent herewith.

O'BRIEN, PIZZUTO and SANTUCCI, JJ., concur.

Ordered that the order is reversed, on the law and as a matter of discretion, without costs or disbursements, the petition is reinstated, and the matter is remitted to the Family Court, Orange County, for a hearing in accordance herewith; and it is further,

Ordered that in the interim, and until a final determination of the petition, the child is to remain under the supervision of the Department of Social Services.