No. 70,377

STATE OF KANSAS, *Appellee*, v. MARC R. WARDEN, *Appellant*.

(891 P.2d 1074)

Opinion filed March 10, 1995.

Ron W. Paschal, of Wichita, argued the cause for appellant; J. Patrick Lawless, assistant appellate defender, argued the cause, and Jessica R. Kunen, chief appellate defender, was with him on the brief for appellant.

Debra S. Peterson, assistant district attorney, argued the cause, and Nola Foulston, district attorney, and Robert T. Stephan, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: The defendant, Marc R. Warden, was convicted of indecent liberties with a child. This direct appeal raises issues concerning the victim's competency to testify and ability to communicate.

The alleged victim, JK, 12 years old at the time of trial, was diagnosed with autism and severe or profound mental retardation. Autism is a developmental disability which typically arises during early childhood. Autism is defined in the American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders § 3, p. 38 (3d ed. rev. 1987) and may involve cognitive disorder, including mental retardation, and an inability to communicate. Among the impairments associated with autism are impaired social interaction, impaired imitation of others, limited or no speech,

and a restricted repertoire of abilities, activities and interests. People with autism frequently become distraught at any change in their physical environment or in their schedule or routine.

JK became a resident at the Institute of Logopedics (IOL) (now called Heartspring) in Wichita in September 1989. Prior to JK's admission he was nonverbal and nonexpressive, had limited receptive language, and did not respond to verbal directions. Nonverbal tests, including completing puzzles and identifying letters of the alphabet, were conducted to evaluate JK's skills. Through one such test in 1991, JK was classified at a mental age of 27 months; however, that test was believed to be invalid. In general, JK had skills comparable to those of a "normal" two- or three-year-old, but he performed some skills at the five-year-old level. JK was able to select his name from a group of words, as long as there were no other words beginning with a "J." He was able to identify only 5 letters of the alphabet. By 1992 JK still had no verbal skills but was able to sign (sign language) some words, indicate yes and no, respond to commands, and use a picture communication book to identify his immediate needs and wants. Among JK's skills were riding a bicycle without training wheels, walking backwards on a balance beam, dressing himself, brushing his teeth, and buttoning a shirt; JK had good motor skills.

Terese Conrad, a speech pathologist at IOL, noted that JK adapted quickly to communication systems, and she believed that he understood more than he was able to express. In February, 1992, IOL began using facilitated communication with some of its students, and Conrad selected JK as one of her first two students to use facilitated communication.

Facilitated communication is a method of helping an individual produce typewritten material on a keyboard or communication device with the intention of compensating for difficulties in motor control. It gives nonverbal individuals access to an alternative communication system. The technique was developed by Rosemary Crossley in Australia in the 1970's and introduced to the United States by Dr. Douglas Biklin in 1989. During facilitated communication, the communicator, or speaker, is typically supported above or below the wrist; ideally, the facilitator moves fur-

ther and further back on the arm or shoulder so that there is less direct contact and eventually no contact, a technique known as "fading." The facilitator applies backward pressure and centers the speaker after each letter is typed to prevent the speaker from perseveration, or striking the same key again and again. Because facilitated communication is a joint activity, there is the potential for "cuing," where the facilitator may knowingly or unknowingly anticipate or in some other way be involved in assisting the individual in selecting certain letters.

The technique has not received unanimous support in the scientific community. Some members of the scientific community believe that facilitated communication is not a valid communication, while others think there has not yet been enough research on the technique to prove or disprove its validity. Drs. John Jacobson and Allen Schwartz of the New York State Office of Mental Retardation and Developmental Disabilities, both of whom have conducted research on the technique of facilitated communication, opined that the scientific community has not accepted the validity of facilitated communication because of the absence of scientific research demonstrating its validity. Rather, each instance of facilitated communication should be tested for validity. Dr. Henry Marks, the director of the department of psychology at IOL, opined that for some individuals, including JK, facilitated communication is valid.

Several studies reveal that the technique in general has not been validated. A study in which Drs. Jacobson and Schwartz were involved, the OD Heck study, evaluated the use of facilitated communication with 12 autistic individuals, all diagnosed with severe or profound mental retardation. Three conditions were evaluated. In the first condition, the speaker was shown a picture not seen by the facilitator, and the speaker described the picture without the use of facilitated communication. In the second, the speaker was shown a picture not seen by the facilitator, and the speaker described the picture with the assistance of facilitated communication. The third condition involved both the facilitator and the speaker being shown a picture, half the time the same picture and half the time different pictures. The subjects were

facilitated at the wrist or hand. A panel of five evaluators voted on whether the speaker's answer comported with what was expected. The study revealed that if the facilitator did not see the picture, the speaker was unable to produce an accurate label. When the facilitator saw a picture, the labels were correct 43% of the time, but half of those labels were accurate for the picture seen by the facilitator and not by the speaker. Though these 12 subjects had been reported to be facilitating at the conversational level prior to the study, none of the subjects were able to validate their communication during the OD Heck study.

Another study in which Dr. Jacobson was involved, the Rome study, evaluated 23 individuals, two of whom had autism (one was legally blind) and all of whom were classified as having severe to profound mental retardation, except one classified as moderately retarded. The speakers were shown a picture of a common everyday object present in their environment and told what it was, outside the presence of the facilitator. The facilitator was then brought in to assist the speaker in naming the object or describing it. This is known as "message passing." The Rome study produced no communication which was validated, though each subject had three trials in which to perform the task.

Other studies reach similar results. For example, the case study of Carla, a 29-year-old mentally retarded woman, revealed that she was unable to validly answer questions when her facilitator was not able to hear the question or heard a different question. A similar study of eight individuals in Australia was conducted. The subjects were facilitated overhand, except one or two who used head pointers. Accurate results were obtained only when both the facilitator and the speaker heard the same question. Where the facilitator's hearing was blocked and he or she did not hear the question asked, the results were invalid. Two Illinois speech pathologists discovered that for accurate responses to questions, the facilitator must hear the same question as the speaker, the facilitator must know the answer, and the facilitator must be able to look at the keyboard while the speaker is typing.

Other studies suggest that facilitated communication has been validated. A 1992 study in Australia tested the IQ scores of five

individuals. The facilitators listened to loud noise through earphones while another person asked the subjects to select certain pictures. The IQ scores of three of the subjects substantially improved through the use of facilitated communication.

Dr. Marks conducted message-passing research at IOL to test the validity of facilitated communication. Eleven students attempted to convey the same message with two different facilitators. Each student selected a word from a list of 50 known words. In the first trial, only one student successfully communicated the same word with the second facilitator. The remaining 10 students were given 12 practice trials of communicating the word with the first facilitator; five of the students had the practice trials on the same day and five had the trials spread out over four days. The students then attempted to convey the practiced word with the second facilitator. One student dropped out. Of the remaining nine students, two of the students who had the practice trials over a four-day period—including JK—successfully completed the task.

JK used various communication devices which had keys with the letters of the alphabet, numbers, and various symbols (like those found on a normal typewriter or computer keyboard). JK was able to use facilitated communication with at least 3 or 4 different facilitators, and he had experience with as many as 10 or 11 facilitators at various times. When Terese Conrad began facilitating with JK, she applied a great deal of backward pressure to his wrist. According to Conrad, JK has poor eye-hand coordination and is impulsive, and he frequently looks away from the selection rather than maintaining eye contact while making the selection, so the backward pressure is necessary to prevent JK from typing until she knows he is looking at all of the selections. By early 1993, Conrad was able to support JK at the forearm or elbow rather than the wrist if JK was calm. As JK moves forward to select a letter, Conrad prevents JK from perseveration on the same key. At the *Frye* hearing (to be discussed later) on Warden's motion to suppress facilitated statements, Dr. Marks and Terese Conrad both opined that JK was validly communicating through facilitated communication. However, Dr. Schwartz reviewed JK's

IOL records and disagreed, though he had never observed JK facilitate. Schwartz opined that JK had good motor skills and should not require facilitation to point to a yes-no board.

Among the premises upon which facilitated communication is based is an assumption that the speaker is competent. Dr. Biklin, who introduced the method of facilitated communication in the United States following training in Australia by the technique's founder, assumes that there is an undetected literacy already present in persons with autism, though this assumption has not been confirmed by scientific methodology. One of Biklin's premises is that facilitated communication helps individuals compensate for apraxia, or difficulty in controlling motor movements, including difficulty in actually starting to do something independently as well as difficulty in controlling the tongue or lungs and therefore in articulating speech. However, apraxia has not been established as a reason autistic individuals have difficulty communicating.

Biklin recommends that a protocol be followed in instances where abuse is alleged through facilitated communication. There is a potential for misleading responses where short answers are typed which do not fully describe the response intended, so the speaker should be asked to continue with his or her response. A preponderance of yes-no questions should not be asked. If the individual facilitates with several facilitators, facilitation should take place with more than one facilitator concerning the abuse to determine whether the same type of information or the same incident is reported using different facilitators. Other aspects of protocol which should be followed include the facilitator looking away from the keyboard or wearing headphones.

The defendant, Marc Warden, was employed at IOL from March 14, 1989, to June 1, 1992. Warden worked initially on a "relief" basis with JK and then began working with JK as a "traditional" caregiver on March 10, 1992, with responsibilities including residential care. Warden also taught independent living skills, recreational skills, and behavior management.

About three months after JK began using facilitated communication, Conrad received information JK was having problems with his residential case manager (not Marc Warden) concerning

JK's tantrums when the caseworker's pants were off. The tantrums would continue until the case manager put his pants on. Conrad was unsure how to pursue the issue with JK, and she asked Dr. Marks to help interview JK. Facilitating JK at the wrist, Conrad assisted him in responding to questions. Several interviews took place over a period of days. On an Epson Real Voice communicator, JK and Conrad facilitated about an incident of alleged sexual abuse.

The first interview was on May 29, 1992. Dr. Marks asked JK if he liked various individuals he lived and worked with, and JK indicated yes to each. However, when JK was asked if he liked Marc Warden, JK typed NO NO NO. When asked what he disliked about Warden, JK typed DONTASK. On June 1, 1992, Dr. Marks again asked JK about Warden. JK typed HUPMQU. When asked what Dr. Marks could do to help, JK typed STOPMARC-SYONPLTASD. Asked to clarify the last word, JK typed PLEASE. Asked to clarify the third word, JK typed JJSOON. JK then spelled ASKABOUT DUDAD, and then continued typing HUAVE PENIS UANFDHUCECR YOU ATPEOIU PKPPD. In response to a question about what Warden did, JK typed 1FU-KATOA EASY TOPQFUK. JK was asked if that meant that Warden fucked JK and JK typed YES. Asked whether JK asked Warden to stop, JK typed YESI ASK.

The next day, Marks again asked JK what Warden did. JK typed FUKMSE. Asked whether that meant that Warden administered a suppository (which JK received several times a week), JK typed NOQESZBUCBUTT. Asked about washing him, JK typed TAKE RIND PUTINBUTT. JK never clarified what RIND meant. JK then typed NOPENMJIS in response to a question about what JK thought was put in his butt. The next day, JK typed ASK ABOUT FUK. Asked what he meant by fuck, JK typed JUY7ES and then YERS . JK then typed ASK DAD and then ASK DAD MN,:O (new line) IBUTT K J,OKE (new line) YSDT (new line) I 2HN JL.J,K. Asked what fuck meant, JK typed MUKBUT-THURT. Asked what made it hurt, JK typed JOK K APENIFE (new line) DSDCFF2. JK then typed HUBVVTU BIG IN I PE-NIS. JK later typed HOMEB IS YOURANSRER, and asked

whether that meant home with JK's father, JK typed NO. Asked if his father hurt him, JK typed NO. Asked who hurt him, JK typed MARK. Asked if Warden touched him, JK typed Y7ES. Asked what Warden did, JK typed DID PENIS HJURT. Asked whose penis was hurt, JK typed MARK and then MARKISLE-DASS. Asked if he was mad at Warden and trying to get back at him, JK typed NO.

The next day, Marks asked JK if he hurt his penis, and JK typed NLO. Asked if someone hurt JK's penis, JK typed NO. Asked if someone hurt JK's butt, JK typed YES. Marks responded "very good, Marc" to JK, and asked who hurt his butt, and JK typed BMZZAAFRK. Asked to type the name without extra letters, JK eventually typed MARLK. JK then typed KIKED, and when asked who kicked, JK typed MARKO. Asked who Warden kicked, JK typed MI. Asked if that meant Warden kicked JK, JK typed NNO. Asked the same question again, JK typed YES. Asked whether Warden used his hand to make JK's butt hurt, JK typed NO. Asked what Warden did use to make JK's butt hurt, JK typed PYUN IS. Asked what Warden did with his penis, JK typed OP-EIKINPENOS, and when asked to respell the first word, JK typed PJUTI9N. Asked what Warden put his penis in, JK typed MY BYYTT. Asked if that meant Warden put his penis in JK's butt, JK typed YES. Asked if this happened one time, JK typed NONO and then typed K ISSM. Asked if that was kiss, JK typed NO, and then continued typing PENODSA AT A PYTART6. Asked to retype the first word, JK typed PANTS ON PLEUSD. At another session later that day, JK provided no information concerning the incident.

The next day, Marks explained to JK that the following week some investigators would sit in on their interview, if that was all right with JK. JK typed ISO K. Asked if anyone else had hurt him, JK typed I DONTT PCUO, and for clarification of the third word, KMPOW. Asked if anyone else had done what Warden did, JK typed NO, and asked if Warden was the only one who hurt JK that way, JK typed YEQS. When JK was asked what he would like to happen, he typed I WAMTHIMBTPPO JOSTKILL SULK. Asked if that meant he wanted Warden to kill himself, JK typed YES.

On June 10, 1992, JK was asked additional questions by Dr. Marks, using Conrad as the facilitator. Some of the questions were asked at the request of Wichita Police Detective Beeson, who investigated the report of child sexual abuse, and the interview was tape-recorded for Beeson. JK indicated that he knew the difference between the truth and a lie, and he correctly answered several questions by identifying whether a statement was true or false. JK also properly identified body parts from a diagram, typing HAIR, NOSENOSE, MOUTH, BEKLLY, B22PENIS, MM222NEE (OR MNEE), FOOT, and BIUTT. Asked whether someone hurt him, JK typed YES. Asked who hurt him, JK typed KEEP MARK AWAY. Told that Marks meant it when he said he would not let him hurt JK again, JK typed I HOPE SO. Asked whether it was daytime or nighttime when Warden hurt him, JK typed NQWESTUN IS HARD. Asked if it was after dinner, JK typed OSO NO. Asked whether it was after bedtime, JK typed NO (new line) BEFORE BED. Asked in what building the incident occurred, JK typed MY HOUSE. In response to whether that meant his house on the IOL campus, JK typed 2"YGES. Asked how many times Warden hurt him, JK typed 1NO MPORE XMANY. Asked if that meant many times, JK typed YES. Asked when the last time was, JK typed QWWWESTUN HAR!1D. Asked if it was on the weekend, JK typed AQDC YES. Asked if it was on a weekday, JK typed GHH006Y. Asked if on a Monday, JK typed YES. Asked who else was there, JK typed BK OY. Asked whether that meant "boy," JK typed KOY. Asked if that meant Koy, JK's roommate, JK typed YES. Asked if Warden hurt Koy, JK typed NO. JK also indicated that his clothes were OTFF when the incident occurred. The interview then ended.

On each occasion JK typed about the abuse, Conrad was his facilitator. She did not wear headphones nor were other steps taken to insure she could not hear the questions. Conrad did ask JK if he would convey the information with a facilitator other than herself, and JK refused.

JK's medical treatment at IOL included extensive use of suppositories due to a distended bowel. No physical evidence was collected from JK after his report of abuse because a physical

examination might be traumatic for him and his extensive use of suppositories would possibly interfere with the results of the examination.

JK testified at trial with Terese Conrad as his facilitator. JK used a yes/no board and also a Canon communicator to respond to questions. As with JK's statements before trial, Conrad did not wear headphones nor were other steps taken to insure she could not hear the questions. In fact, she heard all the questions asked at all times during the proceedings. When JK testified in court, he was not calm and was supported at the wrist.

JK indicated that he knew who Warden was and that he saw the person who hurt him in the courtroom, but he pointed to "no" when asked if he could point to the person who hurt him. Asked if Warden hurt him, JK typed ASS. Asked where he was when Warden hurt him, JK typed GAT FAW, and then he typed FUK when asked to keep trying. Asked if that meant "fuck," JK pointed to "yes" twice. JK pointed to "no" in response to questions whether Warden fucked his ear, mouth, or toes, and JK pointed to "yes" three times when asked whether Warden fucked his butt. JK then pointed to "no" in response to questions whether Warden fucked him with his nose, mouth, or a suppository. JK was asked if he knew what a penis was, and he pointed to "yes." Asked if Warden used his penis to fuck JK's butt, JK pointed to "yes." JK also indicated by pointing at "yes" that the incident occurred in Wichita.

Because testimony in the courtroom was traumatic for JK, cross-examination occurred in a room outside the presence of the jury, and the testimony was shown to the jury on closed-circuit television. JK typed that his mother's name was YTURBEE and his father's name was STEVE. Asked how many times he had been asked if somebody hurt him, JK typed RAT. When he was asked if Terese Conrad was always with him when he was asked about being hurt, JK typed AT SCHOOL, and when asked if Dr. Marks was always with him, JK typed AFTEN. Asked if he uses the communicator with people other than Conrad, JK responded SOME. Asked when his birthday is, JK typed WAS CIPL WEAKS. Asked if he had a sister, JK typed QWESTUN and then

DUM. JK typed ASS when asked if Warden ever had to give him suppositories. Asked what city his mother lived in, JK typed T, and asked if he could tell where his mother lived, JK typed NO. JK's mother's last name is Yturbe, his father's first name is Steve, and JK had had a birthday three weeks earlier.

Wichita Police Detective Beeson interviewed Marc Warden on June 11, 1992. Warden signed a written waiver of his *Miranda* rights. Warden told Beeson several times that he had engaged in no inappropriate touching with JK. Warden then admitted that a couple of weeks earlier, Warden was taking a shower in the apartment where he was assigned to stay with JK. JK had been put to bed, but while Warden was in the shower JK came into the bathroom to use the toilet. Warden got out of the shower while JK was naked and standing at the toilet urinating, and Warden's erect penis rubbed against JK's back as Warden walked behind JK. Warden also stated that he moved his penis up and down JK's back and pushed it up to JK's anus but did not penetrate. Warden indicated he knew how much it hurt to be penetrated, and he did not want to hurt JK. Warden did not ejaculate; he then got dressed. Warden also admitted that he would rub JK's buttocks when administering suppositories, but he did not know why he would do so.

Warden also made an admission to a co-worker at IOL, Holly Miller. Miller testified that Warden told her he was accused of molesting JK. Miller asked Warden if he did it, and Warden told her he did. Explaining what happened, Warden indicated he had fondled JK on one occasion but Warden denied doing the same thing to anyone else. Warden did not describe in detail how he fondled JK. Miller also testified that Warden told her he did not remember his interview with Detective Beeson and that he was under the influence of alcohol when he gave the interview. Detective Beeson testified that Warden did not appear to be under the influence of alcohol or other drugs at the time of the interview.

Warden testified at trial. He testified that Detective Beeson informed him more than once that he was accused of putting his penis in JK's anus. Warden told Beeson several times that he

never did anything inappropriate to JK. During the interview, Beeson asked Warden if he had ever been sexually abused, which upset Warden because he had been abused many times but never told anyone. Warden felt scared and did not want to continue the interview, but Beeson offered to help Warden. Warden admitted that he told Beeson he had rubbed his penis on JK's anus. Warden testified:

"[Beeson] starts going okay, you're in the shower, you have an erection, [JK] comes in the bathroom, he's naked, you see [JK], you get out of the shower, you walked up behind him and you do what. And me, I'm just wanting to get out of there, I just went along with what he said, I confessed to something I had not done, I told him I rubbed my penis on his butt."

Warden testified he confessed to something he did not do because he was scared and "wanted to get out of there"; he merely went along with what Beeson wanted to hear. Warden also insisted that his admission to Holly Miller was merely to repeat what he had told Detective Beeson.

The jury found Warden guilty of indecent liberties with a child. The trial court sentenced Warden to a term of incarceration of 3 to 10 years. Warden appealed to the Court of Appeals, and the appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

## I. *FRYE V. UNITED STATES*, 293 F. 1013 (D.C. Cir. 1923)

Prior to trial, Warden sought to suppress JK's out-of-court statements made through facilitated communication and also to prevent JK from testifying in court through facilitated communication. Warden argued that the technique of facilitated communication has not met with general acceptance within the scientific community and therefore statements made through facilitated communication do not satisfy *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The State argued that *Frye* does not apply because at issue is simply communication, not scientific evidence; the issue is whether JK was validly communicating. The State suggested that JK's use of facilitated communication had been validated. Moreover, the State reasoned that JK's out-of-court statements would be admissible under the child hearsay rule, K.S.A. 60-460(dd), even if he did not testify.

The trial court held extensive hearings concerning this issue. Among the evidence received was testimony by Drs. Jacobson, Schwartz, and Marks as detailed above. The testimony revealed that the scientific community has not generally accepted the validity of facilitated communication.

The trial court ruled that *Frye* did not apply. The court found that the issue was whether JK was communicating. Although the trial court did not observe JK's use of facilitated communication first-hand prior to trial, the court stated:

"[W]e've had a great deal of scientific testimony here and I don't want to get lost in jargon. To me the DSM-III is an extremely useful tool in categorizing people but people are not their labels. [JK] is more than simply a diagnosis, he is what he is, the diagnosis is the nearest pigeonhole we can find for him.

"I don't think that's conclusive, although certainly the diagnosis of acute autism and retardation is perhaps helpful to experts in discussing him as compared with others but I find that he is more than his diagnosis. There is indication that he communicates. And this is before this incident and his communications pointing to pictures, his ability to show affection, and the demonstration of the technique of backward pushing merely keeping him off the keyboard is indicative of other than direction or cuing.

"But that having been said there are things about the particular incident which are validating. That the facilitator did not previously know that [JK] was going to make an accusation of abuse, his—the things typed by him with the aid of his facilitator seems to speak for themselves and there is some detail corresponding to the statements that have been proffered with regard to the penis and the butt. And some independent validations, pointing to names and things like that.

"I believe that there is enough—I'm going to find that there's enough apparent reliability that these things may be shown to the jury if [JK] remains unavailable. I also believe and — that juries are capable of listening to the arguments that [defense counsel] has made about the reliability of this thing.

"The Court is not God. I think that there are many things to be argued back and forth about this as to how reliable [JK's] communications are. I am willing to place the faith in the jury, let them hear the evidence and make the argument to them."

At trial, Warden renewed his objection to JK's statements using facilitated communication. The trial court renewed its finding that *Frye* did not apply. The trial court did prohibit testimony interpreting JK's typed statements, which could fall within the realm of *Frye* as scientific testimony. Rather, only the actual letters typed by JK were admitted.

The general rule enunciated in *Frye* prohibits expert testimony concerning a scientific principle or discovery unless the principle is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. This court has adopted the *Frye* test concerning the admissibility of scientific evidence. See *State v. Witte*, 251 Kan. 313, 836 P.2d 1110 (1992); *State v. Lowry*, 163 Kan. 622, 629, 185 P.2d 147 (1947).

"The *Frye* test requires that, before expert scientific opinion may be received in evidence, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. If a new scientific technique's validity generally has not been accepted as reliable or is only regarded as an experimental technique, then expert testimony based on its results should not be admitted into evidence." *Witte*, 251 Kan. 313, Syl. ¶ 3.

The party seeking to admit the scientific opinion has the burden of satisfying the *Frye* test. See *Witte*, 251 Kan. 313, Syl. ¶ 4. The rationale behind the *Frye* test is as follows:

" '*Frye* was deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles. . . . Several reasons founded in logic and common sense support a posture of judicial caution in this area. Lay jurors tend to give considerable weight to "scientific" evidence when presented by "experts" with impressive credentials. We have acknowledged the existence of a ". . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' " [*People v. Kelly*, 17 Cal. 3d 24, 31-32, 130 Cal. Rptr. 144, 549 P.2d 1240 (1976).]

"[A] jury of laymen should not, on a case-by-case basis, resolve a dispute in the scientific community involving the validity of a new scientific technique. Courts should be reluctant to resolve the disputes of science. It is not for the law to experiment, but for science to do so. Without the *Frye* test, juries would be compelled to make determinations regarding the validity of experimental or novel scientific techniques. As a result, one jury might decide that a particular scientific process is reliable, while another jury might find that the identical process is not. Such inconsistency concerning the admissibility of a given scientific technique or process in criminal cases would be intolerable." *State v. Washington*, 229 Kan. 47, 54, 622 P.2d 986 (1981).

See *Witte*, 251 Kan. at 323.

The *Frye* test is applicable to physical scientific evidence as well as to testimony concerning a psychiatric diagnosis. See *State v. Marks*, 231 Kan. 645, 654, 647 P.2d 1292 (1982). Its general

acceptance rule has been applied to a variety of scientific evidence in Kansas. See, *e.g.*, *Witte*, 251 Kan. 313 (horizontal gaze nystagmus test); *State v. Deppish*, 248 Kan. 217, 807 P.2d 144 (1991) (DNA profiling evidence); *State v. Miller*, 240 Kan. 733, 732 P.2d 756 (1987) (identification of marijuana); *State v. Hodges*, 239 Kan. 63, 716 P.2d 563 (1986) (battered woman syndrome); *State v. Haislip*, 237 Kan. 461, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985) (events recalled subsequent to hypnosis); *Marks*, 231 Kan. 645 (rape trauma syndrome); *Washington*, 229 Kan. 47 (multisystem method of enzyme analysis); *State v. Parson*, 226 Kan. 491, 601 P.2d 680 (1979) (blood alcohol tests); *Tice v. Richardson*, 7 Kan. App. 2d 509, 644 P.2d 490 (1982) (HLA test for paternity). However, the *Frye* test has been held inapplicable to the use of a narcotics dog and to testimony by a "gang expert." *State v. Barker*, 252 Kan. 949, 850 P.2d 885 (1993); *State v. Tran*, 252 Kan. 494, 847 P.2d 680 (1993).

The admissibility of facilitated communication is an issue of first impression in Kansas. Only four published decisions in the United States address the admissibility of facilitated communication. All hail from New York. Two of the cases are from the family court and one was a county court case. The fourth is from New York's equivalent to our Kansas Court of Appeals.

The first case addressing the technique was *Matter of DDS v. Mark S.*, 156 Misc. 2d 393, 593 N.Y.S.2d 142 (Fam. Ct. 1992). *Mark S.* involved the admissibility of a 16-year-old nonvocal autistic child's out-of-court statements concerning abuse by her father in an action to remove the child from the home. The court framed the issue as to whether the child had actually made a statement. The court refused to analogize facilitated communication to other simultaneous transmissions from one form of English, such as American Sign Language, to spoken English because the validity of the method of communication has not been established. 156 Misc. 2d at 406. Noting that the statement could not be admitted without testimony concerning the technique used to acquire the statement, and comparing facilitated communication to hypnotic recall, polygraph tests, and trauma syndrome evidence, the court held that the *Frye* test applied. 156 Misc. 2d

at 399-401. The relevant scientific community included physicians, psychologists, psychiatrists, educators, neurologists, and speech and language pathologists. 156 Misc. 2d at 403. The court held that facilitated communication "has not passed from the stage of experimentation and uncertainty to that of reasonable demonstrability." 156 Misc. 2d at 405.

*Matter of M.Z.*, 155 Misc. 2d 564, 590 N.Y.S.2d 390 (Fam. Ct. 1992), was decided the day after *Mark S.* As in *Mark S.*, at issue were the out-of-court statements made through the use of facilitated communication, this time by a 10-year-old partially verbal child afflicted with Down's syndrome. The court acknowledged its prior ruling permitting out-of-court statements made using facilitated communication, but pointed out that the previous use was in a dispositional, rather than a factfinding, proceeding and that a fair amount of interpretation was necessary with respect to the meaning of the letters typed by the child. 155 Misc. 2d at 577. The court concluded that the party seeking to admit the facilitated statements had not made a prima facie case as to the admissibility of testimony based on facilitated communication by a child with Down's syndrome. One factor mentioned in the court's decision was the absence of evidence of experience using facilitated communication with children diagnosed with Down's syndrome. 155 Misc. 2d at 578. The court also noted the absence of evidence concerning empirical studies of the validity of the communications or the degree to which they were subject to suggestion or interpretation and that the experts who did testify acknowledged that other experts disagree with the assumptions upon which facilitated communication is based and call for more research to test its reliability. 155 Misc. 2d at 575.

Several months later, two other cases involving facilitated communication were decided within days of each other. *People v. Webb*, 157 Misc. 2d 474, 597 N.Y.S.2d 565 (Co. Ct. 1993), considered the testimony of a child victim using facilitated communication during a grand jury proceeding. During the grand jury testimony, the facilitator was equipped with headphones through which "white noise" was produced, so the facilitator was unable to hear the questions asked of the child. 157 Misc. 2d at 476.

The facilitator was sworn to assist the witness with his answers without adding to, subtracting from, or changing in any way the testimony of the witness. 157 Misc. 2d at 479. The court noted the importance of ascertaining that the witness is able to understand the questions asked and that the witness' answer is not guided, controlled, suggested, or changed by the facilitator. 157 Misc. 2d at 476. The *Webb* court distinguished *Mark S.* and *M.Z.* because those cases involved out-of-court facilitated statements, whereas the facilitated testimony in the grand jury proceeding was live and the jurors actually observed the witness and the facilitator and saw and heard the communication device produce the witness' responses. The court stated, "This mechanism of communication is a relatively new one for transmission of the answer of a witness. However, it has not been shown thus far that this process involves any interpretation or substitution of testimony by or from a third party." 157 Misc. 2d at 477-78. The court did not apply the *Frye* test. However, the court recognized that "[i]f, contrary to the Court's impression from review of the Grand Jury minutes, this mode of communication *does* involve reliance upon scientific conclusion, then there may well be serious questions as to whether those procedures enjoy sufficient acceptance in the scientific community which uses them to justify their reception and use in evidence here." 157 Misc. 2d at 478. The court therefore planned a hearing in limine prior to trial of the defendant to inquire further into the technique of facilitated communication, with the burden on the State "to show the nature of the communicative process and its claimed normality as a direct rendering of the words of the witness." 157 Misc. 2d at 478-79.

Finally, in *Matter of Luz P.*, 189 App. Div. 2d 274, 595 N.Y.S.2d 541 (1993), New York's court equivalent to the Kansas Court of Appeals considered the use of facilitated communication in a child protective proceeding. Luz, an 11-year-old nonverbal girl diagnosed with autism and mental retardation, conveyed through facilitated communication that her parents were sexually abusing her. Prior to a factfinding hearing, the trial court ordered a *Frye* hearing to determine the scientific reliability of facilitated communication and placed the burden on the Department of Social

Services (DSS). The court then dismissed the action after DSS requested a continuance to obtain expert witnesses from out of town in an attempt to comply with *Frye.* 189 App. Div. 2d at 277.

The appellate court reversed, holding:

"The test for the court in cases such as these is a pragmatic one. Can the interpreter, or in this case the facilitator, effectively communicate with the witness and reliably convey the witness's answers to the court? A determination of these questions does not require expert testimony. To the contrary, the proffered facilitated communication lends itself to empirical rather than scientific proof." 189 App. Div. 2d at 279.

In holding that the *Frye* test does not apply, the court said:

"[S]ince the ability of an interpreter, translator, 'signer', or anyone else who transmits the testimony of a witness is not based on a scientific theory, any application of the *Frye* test is inapposite. Clearly no *Frye* test was appropriate or necessary before a Spanish interpreter was provided for Luz's parents, the respondents in this proceeding. Indeed, there was not even an attempt made on the record to determine which dialect of Spanish the respondents spoke. It was enough that the interpreter and the respondents could understand each other and that the interpreter swore to translate accurately. There is no present requirement, nor has it ever been considered necessary in the past, to establish that translation from Spanish to English and vice-versa must have a scientific basis. Inasmuch as such a preliminary showing is not necessary with regard to the interpreter and the respondent parents, there is similarly no basis for concluding that the presentation of expert scientific evidence is necessary with respect to Luz's facilitator, who would only assist her in communicating her responses to the court and would not translate any of the questions put to Luz." 189 App. Div. 2d at 280-81.

The appellate court further held that before admitting statements made using facilitated communication, the trial court must satisfy itself that the testimony as transmitted by facilitation is in fact the testimony of the autistic child, uninfluenced by the facilitator, and also that the witness understands the nature and obligations of the oath.

It is our understanding that the *Luz* case was returned to the trial court and that the trial court found statements made using facilitated communication inadmissible after conducting tests to validate the facilitated communication. The case is again on appeal.

We are not persuaded that statements produced through facilitated communication are scientific evidence subject to the *Frye* test. Facilitated communication is just what its name implies: a method of communication. Unlike the tests revealing that JK is autistic and mentally retarded, which require scientific interpretation of JK's skills and behaviors, facilitated statements require no scientific interpretation. The device used produces a typewritten tape of what is entered; the content of the statements are capable of interpretation by lay jurors just as any other form of written English. The trial court here ruled that witnesses would not be permitted to interpret JK's responses as shown on the tape and as pointed to on the yes/no board; that was a task left to the jury. Because facilitated communication requires no scientific testimony, the *Frye* test is inapplicable. To admit statements made using facilitated communication, a party need not show the technique has achieved general acceptance in the scientific community.

However, when statements made using facilitated communication are admitted at trial, certainly the credibility of those statements and the weight to be given them are issues for the finder of fact, just as with other types of testimony. See K.S.A. 60-420 (any party may introduce extrinsic evidence concerning any other matter relevant upon the issues of credibility). Testimony challenging the validity of such communication is admissible. Such testimony may include evidence of the technique of facilitated communication, its origins, and its acceptance by the scientific community in which it is used. The trial court, after holding that *Frye* did not apply to the admission of facilitated statements, permitted evidence challenging the validity of the facilitated communication process itself. This was proper.

## II. PROTOCOL

Immediately before JK's testimony at trial, Warden asked the trial court to adopt a protocol similar to that suggested by Dr. Biklin of using a facilitator other than Terese Conrad for purposes of JK's testimony to insure its validity. Alternatively, Warden asked the court to implement other protocol suggestions such as

ordering Conrad to divert her eyes from the communication device and to wear earphones that played music so she could not hear the questions propounded to JK. The State objected, pointing out that the request for protocol was made for the first time immediately prior to JK's testimony and that using an alternative facilitator or earphones would place JK in a situation with which he was not familiar. The trial court ruled as follows:

"As to the protocol by Mr. Biklin, first of all, Mr. Biklin is one of the leaders in this field; but on the other hand, it's a pretty new field, in fact it is so new that I have not permitted people who might otherwise be called experts to testify as to their conclusions about what [JK] is saying for the very reason that I really think this jury is in a position where they may very well be as able to tell what he means as the expert because there isn't a consensus on this thing.

"[JK] is an individual, I think as an individual we have evidence on the record that familiarity and predictability are essential if he is to have any chance at all of communicating. And for that reason I think there's abundant evidence that to change the protocol at this time is to almost make it a worthless exercise to attempt it.

"I am therefore going to go ahead and permit [JK] to testify under the, quote, protocol that we've already been using here or the method that we've started using . . . ."

Warden now argues that the trial court erred in failing to implement the protocol he requested. He points out the dangers associated with facilitated communication, including the danger of facilitator cuing. Warden likens facilitated testimony to hypnotically refreshed testimony because both are inherently suggestive procedures. *Frye* renders inadmissible statements made under hypnosis when offered for the truth of their content; a witness may only testify as to events recalled prior to hypnosis. See *Haislip*, 237 Kan. at 479-482. However, a defendant, in keeping with the right to testify on one's own behalf, the right to conduct a defense, and the right to due process, may testify even as to events recalled only after hypnosis if the defendant proves that certain safeguards during hypnosis were followed. *State v. Butterworth*, 246 Kan. 541, 553-54, 792 P.2d 1049 (1990). Warden reasons that, as with a defendant's posthypnotic recollections, facilitated communication is subject to following a strict protocol to prevent or minimize cuing or facilitator influence. Warden

claims that the trial court's failure to implement the protocol deprived him of a fair trial.

The State argues that the trial court did not abuse its discretion in refusing to implement the requested protocol. The State reasons that Warden's request to implement the protocol was untimely. It also asserts that under *Butterworth*, posthypnotic recollections may be admitted in the trial court's discretion even when all of the procedural safeguards are not followed (*Butterworth*, 246 Kan. at 555-56.); thus, facilitated statements may be admitted in the trial court's discretion even though the recommended protocol is not followed. Moreover, the State suggests that it is for the jury to assess the weight of facilitated statements. The jury was aware that Terese Conrad was the only facilitator who worked with JK when he told of the abuse, though the recommended protocol was to use more than one facilitator, and the jury was aware Conrad did not wear headphones during JK's testimony, though that safeguard was also recommended. The State also reasons that the jury was presented with evidence tending to show JK's statements were not the product of cuing: Conrad testified she had no knowledge of the abuse before JK began typing about it; JK exhibited other unusual behavior before describing the abuse (he threw a tantrum when his caregiver had his pants off); the spelling, grammar, and word choice in JK's statements were inconsistent with Conrad's; Conrad had no vested interest in the statements; Conrad facilitated with a student who retracted a previous statement made to another facilitator accusing Warden of abuse; Conrad facilitated with another student who gave a statement to Conrad that Warden had never abused him; and JK's statements were validated by Warden's confession. The State contends that JK's statements were not so unreliable that the trial court abused its discretion in admitting the statements into evidence.

The admission of evidence, and the manner in which it is received, lies within the sound discretion of the trial court. See *State v. Vaughn*, 254 Kan. 191, 204, 865 P.2d 207 (1993); *State v. Tran*, 252 Kan. 494, Syl. ¶ 5, 847 P.2d 680 (1992); *State v. Friberg*, 252 Kan. 141, Syl. ¶ 5, 843 P.2d 218 (1992). Our standard of

review of the trial court's failure to implement the requested protocol, therefore, is whether the trial court abused its discretion. Judicial discretion is abused if judicial action is arbitrary, fanciful, or unreasonable, which is another way of stating that discretion is abused only if no reasonable person would take the view adopted by the trial court. If reasonable persons could differ regarding the propriety of the action taken by the trial court, it cannot be said that the trial court abused its discretion. *State v. Brown*, 249 Kan. 698, Syl. ¶ 10, 823 P.2d 190 (1991).

None of the recommended protocol was followed here. This is not a case of substantial compliance or even minimal compliance. Terese Conrad was not even directed to divert her eyes from the communication device as she helped JK type his responses. However, Warden has not shown that the trial court abused its discretion in failing to implement the requested protocol.

The better practice would be to implement the recommended protocol during a witness' in-court testimony by means of facilitated communication. Such a protocol would go a long way toward protecting against the potential for facilitator influence or cuing. However, there was testimony here that familiarity and predictability were essential if JK was to be able to communicate. Warden's request to implement the protocol was made immediately prior to JK's testimony and was untimely. Warden was aware the State intended to present JK's testimony through facilitated communication, and Warden had ample opportunity prior to trial to request that the recommended protocol be followed. In addition, the jurors were aware of the recommended protocol and could observe for themselves that it was not followed. The failure to follow the recommended protocol goes to the weight of JK's testimony, not to its admissibility. The trial court did not abuse its discretion in failing to implement the recommended protocol during JK's testimony because the request was untimely.

Warden also points out in his discussion of this issue that Terese Conrad was not sworn as an interpreter at the time of JK's testimony. K.S.A. 75-4351 provides for appointment of a

qualified interpreter for persons whose primary language is one other than English or who are deaf or mute or both. K.S.A. 75-4354 states: "Every interpreter appointed pursuant to the provisions of K.S.A. 75-4351, before entering upon his or her duties, shall take an oath that he or she will make a true interpretation in an understandable manner to the person for whom he or she is appointed, and that he or she will repeat the statements of such person in the English language to the best of his or her skill and judgment." Terese Conrad assisted JK in giving his testimony. She was not appointed as an interpreter nor was she placed under oath.

Unlike interpreters for the deaf, mute, or persons whose primary language is one other than English, Conrad was not required, or permitted, to interpret JK's responses. JK's testimony was typed on a Canon communicator, a device which prints the responses in English on a strip of paper. Conrad merely stated in spoken English what JK said in typed English. The trial court did not permit Conrad to interpret JK's responses; Conrad was only permitted to read JK's responses letter by letter. Warden did not object to this procedure. Conrad should have been given an oath that she would repeat JK's responses in spoken English to the best of her skill and judgment, including an oath not to influence JK's responses as she assisted him in typing. See *Luz P.*, 189 App. Div. 2d at 281. However, because Warden did not object to the failure to so appoint her and place her under oath, the failure to place her under oath is not reversible error.

### III. HEARING TO DETERMINE JK's COMPETENCY

Warden also argues that the trial court should have made a determination of JK's competency before permitting him to testify. The trial court did make such a finding, though not in the format Warden requested.

Prior to trial, during argument at the *Frye* hearing, Warden argued to the trial court that there was no evidence that JK was cognitive. Warden asked that the trial court question the validity of facilitated communication because it has not been generally accepted within the scientific community. He also asserted that

to admit JK's out-of-court statements under the child hearsay exception, K.S.A. 60-460(dd), required a finding of reliability, a finding Warden argued the court could not make because the technique of facilitated communication has not been generally validated. Pointing out that JK is nonverbal, knows only part of the alphabet, and independently signs a limited number of signs, Warden suggested that the reliability of JK's communication is highly suspect and that there was a question whether JK is really communicating and, if so, whether he understands what he is communicating.

The trial court found that there was an indication JK was able to communicate by pointing to pictures, by showing affection, and by using facilitated communication with only backward pressure, which is indicative of other than direction or cuing. The court also found the incident was validated by the facilitator's lack of knowledge of the incident. The court found "enough apparent reliability" that even if JK should be unavailable as a witness at trial, his out-of-court statements were admissible.

Immediately prior to JK's testimony, when requesting implementation of the protocol described above, Warden asked the trial court to determine if JK was unavailable as a witness for purposes of the child hearsay statute, K.S.A. 60-460(dd). His counsel stated:

"Unavailable, as I understand it, might also mean there's some question as to the witness' competence.

"So first of all, at this point in time I'm asking the Court to enter a ruling as to whether [JK] is unavailable, because it's our position that is if he is in fact unavailable he should not be allowed to testify before the members of the jury because he's not competent as a witness. . . . And we're at the point in time right now we need to determine if this young man is in fact unavailable, in our opinion, before we place him before the jury."

The State argued that the only way to determine if JK was unavailable was to place him before the jury because the factors of courtroom testimony would influence whether JK would be able to communicate in that situation. Warden's counsel responded that the nature of the child hearsay statute contemplates an availability hearing outside the presence of the jury.

The court's ruling was as follows:

"I am not going to rule at this time on the availability of [JK]. It is clear to the Court that independent of questions of competency what we're talking about is a physical capability, given [JK's] handicaps. And by way of pretrial hearing I don't think we could predict whether we tried once or 50 times whether he's going to be able to do it under this particular setting."

JK did testify at trial. Warden acknowledges that the provisions of the child hearsay statute, K.S.A. 60-460(dd), did not come into play. However, Warden contends that if JK was not capable of communicating, he was not available or competent to testify. Thus, the trial court should have determined whether JK was competent and was validly communicating before permitting him to testify. Warden reasons that there was a dispute about whether JK was capable of communicating: JK had no verbal speech, he was mostly unresponsive to verbal directions, he had limited receptive language, and he had no expressive language; he was diagnosed as severely mentally retarded; and Dr. Schwartz opined at the *Frye* hearing that JK was not providing authentic communication.

Warden also suggests that JK was not placed under oath before giving his testimony and that the State made no motion to find JK competent in lieu of an oath. K.S.A. 60-418 states, "Every witness before testifying shall be required to express his or her purpose to testify by the oath or affirmation required by law." The transcript of trial initially prepared by the court reporter indicates only that JK, "called as a witness, testified as follows." However, the court reporter filed an errata sheet indicating that JK, "called as a witness, having been duly sworn, testified as follows." Warden has filed a motion to strike the errata sheet because the court reporter's notes of trial had no mention an oath was given, though the court reporter did recall that the oath was given. A videotape of trial made by a television station and included in the record on appeal upon the State's motion reveals that before JK testified, an "oath" was given as follows. A woman's voice (believed to be the court reporter) asked two questions: "Do you know that you're here today to tell the truth?" "Do you promise the Judge that that's what you're gonna do?" Following each of these questions, one can see on the tape that Terese Conrad's

right arm moved as if she was facilitating a response. However, the tape does not reveal what the response was, nor can the yes/no board be clearly seen on the tape. Warden did not object to the form of the oath given to JK, nor does the trial record reflect any allegation that an oath was not given. No evidence is offered by defendant that an oath was not administered. We do not find reversible error based on the record before us.

Under K.S.A. 60-407, every person is qualified to be a witness and no person is disqualified as a witness except as otherwise provided by statute. K.S.A. 60-417 provides for disqualification of witnesses as follows:

"A person is disqualified to be a witness if the judge finds that (a) the proposed witness is incapable of expressing himself or herself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him or her, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth."

K.S.A. 60-408 sets forth the rules under which the qualification of a witness is to be decided: "When the qualification of a person to be a witness . . . is in issue, the issue is to be determined by the judge . . . . The judge may hear and determine such matters out of the presence or hearing of the jury . . . . But this section shall not be construed to limit the right of a party to introduce before the jury evidence relevant to weight or credibility." The determination of disqualification need not occur outside the presence of the jury except in the instance of an accused's confession in a criminal case. K.S.A. 60-408.

Warden did not specifically move to disqualify JK as a witness under K.S.A. 60-417 prior to or during trial. His argument was that in-court and out-of-court statements made using facilitated communication were inadmissible because the premises upon which facilitated communication is based have not achieved general acceptance in the scientific community, i.e., that the statements do not meet the *Frye* test. He also argued that JK's pretrial statements were not reliable and therefore were inadmissible under the child hearsay statute if JK was unavailable as a witness. Underlying all of Warden's arguments to the trial court was the suggestion that JK was not validly communicating. Looking at

Warden's arguments in totality, Warden has properly preserved his competency argument for appeal.

Warden reasons that JK's competency and availability had to be determined prior to JK testifying. He argues that the trial court should have made a threshold determination of JK's competency and availability prior to JK's testimony. The trial court did make such a determination. In relation to the admissibility of JK's pretrial statements under the child hearsay statute should JK be unavailable to testify at trial, the trial court found that JK's statements met a threshold of reliability warranting their admission at trial even if JK was unavailable. Implicit in this finding of reliability is a finding that communication occurred and that the speaker is competent. The trial court also specifically noted that the jury could hear for itself Warden's arguments as to the reliability of facilitated communication. The trial court did decline to rule on JK's availability until he attempted his testimony; this ruling was proper because, as noted by the trial court, there was no way to anticipate how JK would react to presenting testimony at trial and the determination of JK's competency need not take place outside the presence of the jury. Moreover, after JK's testimony at trial on direct examination, the trial court did refuse to disqualify JK as a witness even though he was unable to respond to cross-examination at that time. Cross-examination was conducted by closed-circuit television at a later point in the trial.

Warden's real argument seems to be that the trial court erred in determining that JK was validly communicating and in the process by which the trial court so ruled. He points out that in *Luz P.*, 189 App. Div. 2d at 279-80, the court ordered a hearing to determine whether Luz was capable of communicating by facilitation:

"[T]he test proposed by the County Attorney, whereby the court could question Luz outside the presence of the facilitator and then hear her responses through facilitated communication, should adequately establish whether this is a reliable and accurate means of communication by Luz. Fact-specific questions can be devised which should demonstrate whether the answers are subject to the influence, however subtle, of the facilitator. If the court is satisfied from this demonstration that the facilitator is 'qualified' to transmit communications from Luz to the court, then the facilitator may be appointed as an interpreter . . . ."

We express doubts about the procedure by which the trial court determined that JK was able to validly communication through facilitation. The court did find evidence that JK was able to validly communicate through other means, such as by pictures and by showing affection. The trial court also pointed out other factors supporting a finding that JK's facilitation was valid, such as the fact that the facilitator had no prior knowledge that JK would make an accusation of abuse. Moreover, the validity of JK's facilitation is supported by Warden's confession and admission, and there was testimony that research conducted at IOL revealed that JK was able to validly communicate through facilitation. However, the trial court made its preliminary ruling without ever having observed JK facilitate and without conducting an independent evaluation such as that recommended in *Luz P.* During JK's testimony no steps were taken to minimize the potential of facilitator influence or cuing. Moreover, JK's facilitator was not appointed as an interpreter and placed under oath to transmit JK's statements without influencing them. See K.S.A. 75-4354.

JK was able to sign yes or no. He does so in the same manner as the general public by shaking his head up and down for yes and from side to side for no. We note from the videotapes that JK was clearly able to sign "hello" and to request a drink of water (which he did on two occasions). Instead of signing for yes or no, JK used a yes/no board and was facilitated in so doing. JK should have been allowed, indeed required, to independently sign yes and no. Where a person is physically able to do so, the yes/no board and communication device should not be held by the facilitator and should be placed on an immovable surface. We note, however, that no objection was made to JK not independently signing yes and no or to the facilitator holding the yes/no board and communication device with one hand and facilitating with the other.

Certainly a person should not be disqualified as a witness because of a disability. On the other hand, a witness in a criminal case must be competent to testify and able to communicate. The method of communicating must be reliable when applied to the witness testifying. Thus, an evaluation must be conducted on a

case-by-case basis because the validity of facilitated communication for one person does not mean that another is also able to validly facilitate. The court should examine the witness to make a threshold finding of validation. As suggested in *Luz P.*, the witness should be questioned outside the presence of the jury to determine competency and ability to communicate. The facilitator should listen to "white noise" or music through headphones while the witness is being questioned. Fact-specific questions should be asked to insure the answers are not subject to facilitator influence or cuing. Tests should be conducted sufficient to convince the trial judge the witness can communicate and is free of any influence of the facilitator. Moreover, the trial court may also consider other evidence bearing on the validity of the witness' ability to communicate through facilitation, including evidence of any research which has been conducted as to the validity of the witness' facilitation. If the trial court is satisfied that the witness' ability to communicate through facilitation is validated, the court may permit the witness to testify. This is a matter for the discretion of the trial judge.

Procedures should also be followed during the witness' testimony using facilitated communication. Steps should be taken to minimize the potential for facilitator influence or cuing, including the headphone technique described above or having the facilitator look away from the communication device. The witness should give independent responses, without facilitation, where possible, such as by using signs or other communication if the witness has such a capability. (For instance, in this case JK could have used anatomical drawings to identify body parts and explain what happened.) The witness must be sworn. The facilitator should be appointed as an interpreter and placed under oath.

Few of these procedures were followed here. However, this failure does not require reversal. A witness is presumed competent to testify, and the burden of establishing incompetency rests with the party challenger. *State v. Colwell*, 246 Kan. 382, Syl. ¶ 5, 790 P.2d 430 (1990). The disqualification of a witness lies within the discretion of the trial court. 246 Kan. at 388.

Warden has not shown the trial court abused its discretion. There is evidence in the record that JK was capable of using

communication systems other than facilitation, including signing and using a picture communication book, showing some cognitive ability. There is also evidence that JK's communication by facilitation was validated by research conducted at IOL. Warden stresses the fact that JK was diagnosed with autism and mental retardation. Tests showed that JK had some skills in the five-year-old range, though his mental ability was generally understood to be in the two- to three-year-old range. The diagnosis of mental retardation was not made using facilitated communication. One theory of autism and why facilitated communication works with autistic individuals is that autistics have a hidden literacy which has not been discoverable because these individuals have had no means to communicate their intelligence. If JK is able to validly communicate by facilitation, there is of course a question about the validity of the tests showing him to be severely or profoundly mentally retarded.

The trial court considered all of this information in deciding that JK's use of facilitated communication was reliable. Warden confessed to the crime, and he made an admission to a co-worker, though he recanted both at trial. More importantly, the jury observed for itself JK's testimony through facilitated communication and could decide what weight, if any, to give his testimony. The jury heard testimony concerning the potential for facilitator influence or cuing and the lack of quantitative research validating any facilitated communication. It cannot be said that no reasonable person would agree with the trial court's ruling permitting JK to testify.

## IV. ORDER IN LIMINE

Prior to trial, Warden made a motion in limine to preclude testimony concerning a suicide attempt by Warden. The court granted the motion. During Holly Miller's testimony at trial, she indicated that she visited Warden in the hospital. The prosecutor asked Miller what happened while she was there, and Miller testified, "Well, I went in and we started talking and I asked him what happened, why he was there. He told me he tried to kill himself and he showed me the cuts on his wrist, I asked him why and —"

Warden objected and moved for a mistrial based on the breach of the order in limine. The State indicated that the breach was unintentional and that Miller's testimony concerning the suicide attempt was unexpected. The trial court denied Warden's motion for a mistrial, finding that the violation was not intentional and not so prejudicial as to require a mistrial. The court stated that the "answer naturally got into it was the cuts on the wrist from which one could infer some attempt at one's own life, although we stopped it at that point. . . . [W]e haven't said there was an attempt on the life, we haven't gone into it." The court further indicated that the jury would not necessarily associate a suicide attempt with guilt or innocence; the accusation itself would be extremely upsetting. The court instructed the jury that Miller had given an answer of a personal matter the trial court had deemed not relevant to the case, and the jury was instructed to disregard the last "couple" of Miller's answers. Miller then testified that when she visited Warden in the hospital, he made an admission that he had committed the offense against JK. There were no further references to Warden's suicide attempt by Miller or any other witness.

On appeal, Warden points out that, contrary to the trial court's statement, Holly Miller did testify that Warden told her he tried to kill himself. Warden cites *State v. Massey*, 242 Kan. 252, 747 P.2d 802 (1987), and argues that the trial court should have granted a mistrial under K.S.A. 22-3423(1)(c), which permits the court to grant a mistrial where prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant. He asserts that the mention of his suicide attempt was highly prejudicial; the implication of this testimony was that Warden had attempted suicide because he was guilty.

A two-part test evaluates alleged violations of a motion in limine. First, there must be a determination whether there was a violation of the order in limine. Second, if the order in limine is violated, there must be a determination whether the testimony elicited in violation of the order substantially prejudiced the defendant. See *State v. Bowen*, 254 Kan. 618, Syl. ¶ 2, 867 P.2d 1024 (1994). The burden is on the defendant to show he or she

was substantially prejudiced. *Massey*, 242 Kan. at 264. Where a trial court denies a motion for mistrial under K.S.A. 22-3423, as occurred here, this court's standard of review is abuse of discretion. See *Bowen*, 254 Kan. 618, Syl. ¶ 5; *Massey*, 242 Kan. at 264. Judicial discretion is abused if judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ regarding the propriety of the action taken by the trial court, it cannot be said that the trial court abused its discretion. See *State v. Brown*, 249 Kan. 698, Syl. ¶ 10, 823 P.2d 190 (1991).

Here, the trial court determined that there was a violation of the order in limine. The State concedes that Holly Miller's testimony that Warden tried to kill himself was in breach of the order in limine. The trial court, however, determined that Warden was not substantially prejudiced by the testimony, giving two reasons. First, the violation was not intentional, and second, the testimony was subject to more than one inference. The trial court instructed the jury to disregard the testimony.

In *Massey*, cited by Warden, the State theorized that the defendant placed a bedspread over his wife before shooting her in the head to prevent gunpowder burns around the entrance wound. The defendant contended the gun discharged accidently while he was experiencing a seizure, implying that there were no powder burns around the entrance wound because the gun discharged from more than two feet away. The bedspread had a hole in it, but no tests were conducted to determine whether it was a bullet hole. The court issued an order in limine barring witnesses from testifying that the hole was a bullet hole. 242 Kan. at 262. One of the State's witnesses testified in violation of the order in limine that the bedspread appeared to have a bullet hole. After Massey's objection and motion for mistrial, the prosecutor elicited from the witness that no tests had been conducted to determine how the hole was made in the bedspread. The court then found that the violation was not intentional and denied the motion for mistrial. The court did not instruct the jury to disregard the testimony. 242 Kan. at 263-64. In closing argument, the State reminded the jury that the lack of powder burns on the victim's wound may have been caused by a barrier inserted be-

tween her head and the gun and that there was a hole in the bedspread though there was no proof what caused the hole. 242 Kan. at 264. This court concluded the trial court abused its discretion in determining that Massey did not suffer substantial prejudice and in failing to grant a mistrial. 242 Kan. at 265.

*Massey* is distinguishable from the case at bar. In *Massey*, the trial court did not instruct the jury to disregard the inadmissible statements of the witness. Though the State elicited from the witness that he had not conducted tests to determine the cause of the hole in the bedspread, in closing argument the State asked the jury to infer that the hole was a bullet hole. Here, conversely, the trial court instructed the jury to disregard the last several answers of the witness. The limiting instruction was done in a way that did not highlight the inadmissible testimony. Moreover, there was no other reference during the trial to Warden's suicide attempt. Warden argues that the jury could draw only one conclusion from Miller's testimony that he had attempted suicide: He attempted suicide because he was guilty of the charges. The trial court, however, found the testimony susceptible to another inference: The mere fact of being charged with the offense could have led to a suicide attempt. Warden has not shown that the trial court abused its discretion in holding that he was not substantially prejudiced by the breach of the order in limine. The testimony itself was not so prejudicial that no reasonable person would fail to grant a mistrial. There was no abuse of discretion.

Affirmed.

HOLMES, C.J., and MCFARLAND, J., dissenting.